Cushing, J.
Plaintiff seeks to enjoin defendants from making effective a schedule of passenger fares filed with the Public Utilities Commission of Ohio as provided by Section 505, General Code.
Plaintiff contends that its officers, employees and the employees of the Peters Cartridge Company, by virtue of a contract, are entitled to ride on defendant’s cars for fares less than that fixed by the schedule for the public; that the contract was entered into June 3, 1902, by .and between the plaintiff and the Rapid Railway Company, predecessor in title to the Interurban Rail *402 way & Terminal Company of which the defendants are receivers, and that so far as the fares to be charged said employees are concerned, the contract supersedes the act of the Legislature-creating the Public Utilities Commission, and any act that the state by its Legislature in the future may enact into law. A copy of the contract is as follows:
“This Agreement entered into at Cincinnati, Ohio, this 3d day of June, A. D. 1902;
‘ ‘ Witnesseth : That a contract has this day been made by and between the Rapid Railway Company, party of the first part, and the King Powder Company, party of the second part, upon the following terms and conditions:
“For and in consideration of one ($1.00) dollar to each of said parties by the other paid, the receipt whereof is hereby acknowledged and mutual covenants and obligations hereby 'assumed, it is agreed that the said the King Powder Company will permit the said railway company to construct upon a right of way forty (40) and sixty (60) feet wide and upon the line shown on the plat hereto attached and made part hereof, a railway, to be operated by electricity, or other improved motive power, except steam, through the property of the said powder company, with the necessary switches, y’s, turnouts, poles, wires and other equipment; and upon the completion of the said construction over the route aforesaid by the 31st day of December, 1902, the said the King Powder Company will, without further consideration, execute and deliver to the said the Rapid Railway Company its conveyance by deed of the title to a right-of-way over the route aforesaid.
“The said the Rapid Railway Company covenants a,nd agrees that it will promptly prosecute the construction of its railway as aforesaid over the said route, and will complete the same by the said the 31st day of December, 1902; and in constructing same, that it will erect and maintain all proper and necessary fences, cattle-guards, crossings and drains for the mutual benefit and protection of its right-of-way, and of the remaining property of the said King Powder Company and that in operating said railway it will sell to the employees ,and officers connected with the said the King Powder Company and the Peters Cartridge Company—
“Monthly tickets, good for fifty rides each in the hands of the purchaser only, between King’s Mills and Lebanon for the sum of $3.00.
“A similar ticket good for transportation between. King’s Mills and Mason for the sum of $2.50.
“It is further agreed ,and covenanted that if, at any time after the completion of said road, the said Rapid Railway, its *403 successors or assigns, shall cease to operate said line of road over and upon the right-of-way as herein granted for a period of ninety (90) days, the said right-of-way herein contracted to be granted through the property of said the King Powder Company shall, at the option of the said King Powder Company, revert and revest in the said party of the second part.
“It is further contracted and agreed that if the said party of the first part shall construct .a line of railway connecting the line herein contracted to be built with the town of M'orrow in the county of Warren, then the said party of the first part shall sell to the officers and employees connected with the said the King Powder' Company and the Peters Cartridge Company monthly tickets good for fifty (50) rides each in the hands of the purchaser only between King’s Mills and the town of Morrow for .a sum not to exceed three ($3.00) dollars.
“It is further agreed and covenanted that the time for the completion of this construction, to-wit, December 31st, 1902, shall be subject to extension by the mutual consent of the parties hereto, and shall receive such further additional time as may be necessary to compensate for delays caused by litigation or unavoidable casualty not within the control of either of the parties to this contract.
“In Testimony Whereof, the said the Rapid Railway Company by vote of its directors has caused its name and corporate seal to be attached hereto, and the name of its President and General Manager to be hereunto signed. And the King Powder Company has caused its name and corporate seal to be hereunto attached and the name of its President to be hereunto signed, at Cincinnati, the day and date first .aforesaid.
(seal.) “The Rapid Railway Company,
“G. R. Scrugham,

“President and General Manager..

“Attest: J. M. Kennedy.
“The King Powder Company,
“G. A. Peters, Pt.,
“Attest: J. H. McKibben, Secy.” “President.”
This contract was dated June 3, 1902. The act of the Legislature creating and defining the Public Utilities Commission, was enacted into law by the state in April, 1906, entitled—
“An Act
“To regulate railroads and other common carriers in this state, create .a board of railroad commissioners, prevent the imposition of unreasonable, rates, prevent unjust discrimination, and to insure an adequate railroad service.”
The sections of the act to be considered are:
*404 “Sec. 505. Each railroad shall print in plain type and file with the commission, within a time fixed by the commission, schedules which shall be open to public inspection, showing all rates, lares and charges for transportation of passengers and property, and any service in connection therewith, which such railroad has established and which are in force at such time between all points in this state upon its line, or any line controlled or operated by it.”
"Sec. 508. No change thereafter shall be made in any schedule, including schedule of joint rates, or in any classification, except upon ten days' notice to the commission. All such changes shall be plainly indicated upon existing schedules, or by filing new sehedulés ten days prior to the time they are to take effect, but the commission, upon application of any railroad, may prescribe a less time within which a reduction may be made. Copies of all new schedules shall be filed as provided in the preceding section in every depot, station and office of such railroad ten days prior to the time they are to take effect, unless the commission shall prescribe a less time.”
“Sec. 510. No railroad shall charge, demand, collect or receive a greater or less compensation for the transportation of passengers or property, or for any service in connection therewith, than is specified in such printed schedules, including schedules of joint rates, as being then in force. The rates, fares and charges named therein shall be the lawful rates, fares and charges until they are changed as provided in this chapter.”
“Sec. 513. Nothing in this chapter shall prevent concentration, commodity, transit and other specitl contract rates, but all such rates shall be subject to the provisions of this chapter as to their printing and filing, shall be open to all shippers for a like kind of traffic under similar circumstances and conditions, and shall be under the supervision and regulation of the commission.”
“Sec. 527. Upon an investigation, if the rate or rates, or any regulation, practice or service complained of is found to be unreasonable or unjustly discriminatory, or the service inadequate, the commission may fix and order substituted therefor, such rate or rates, fares, charges or classification as it shall have determined to be just and reasonable, which shall be charged, imposed and followed in the future. It also may make such orders respecting such regulation, practice or service as it shall have determined to be reasonable, which shall be observed and followed in the future, but no rates fixed shall exceed the maximum rates prescribed by any statute of this state in force at the time the commission fixes such rates.”
*405 Section 527 provides for an investigation of rates by the commission on its own motion.
In October, 1917, defendants filed with the Public Utilities Commission, Tariff No. 30, fixing fares between Lebanon and King’s Mills at fifteen cents, and Mason and King’s Mills at ten cents per ride. On this state of facts the questions presented are:
1st. It being admitted that the contract in question was entered into for the consideration stated, does the act of the state of 'Ohio passed in April, 1906, impair the obligation of contract contrary to the provision of the Constitution of the United States, that “no state shall pass any law impairing the obligations of contract”?
2d. If under the police power, the state had the inherent, continuing power to fix and regulate rates of transportation, was the contract void when entered into, or did it become nonenforeible after the state had legislated on the subject-matter of the contract?
Before discussing the questions with reference to the fundamental law, I shall briefly review the contentions of the parties.
Plaintiff claims:
(a) That there is no discrimination in the fares fixed by the contract, as there is nothing in the contract to prevent the public from having the same rate of fare as said employees. Taking the contention as made, it means that the railroad and the Public Utilities Commission must fix the rate at the contract price; that the contract controls the act of the Legislature, and that the Public Utilities Commission has no power to supervise or regulate said rates of fare. To this contention the answer must be made that the power of the state, acting through the Public Utilities Commission can not be controlled by private contracts between individuals or corporations. The question of legislative power will be considered when I come to pass on the main question in the case.
(5) The defendants by this contract are not estopped to deny the validity of the contract, or that it was ultra vires. The rule is, that a receiver is not bound by a contract, made by a company before his appointment, which does not constitute a lien on the property. The receivers can not be compelled to per *406 form it. This question has reached the text-book stage of the law. High on Receivers, Sec. 393c.
“An action may be maintained against the receivers, by leave of court, to recover damages sustained by plaintiff by the construction of a railway throügh' his premises without making compensation therefor prior to the receiver’s appointment. * * # g0 where a railway company has contracted with a marble company to carry marble from its quarries to a given plant, allowing it to be stopped at an intermediate station to be prepared for the market, and a considerable quantity of marble upon which the freight has been prepaid under the contract is at such intermediate point at the date of the appointment of a receiver over the railway company, an action can not be maintained against the receiver for specific performance.” Sigh on Receivers, Sec. 398a.
(c) Where the validity of a contract is denied or ignored, the only remedy for its violation is a proceeding for specific performance or injunction. The answer to this contention is found in subdivision “b” supra.
(d) The plaintiff has an adequate remedy at law if it seeks compensation for property appropriated to public use. If the parties by contract have agreed on the valuation of the land for a right-of-way, and the contract is breached by a party to it, in a proper action ,a court will assess damages for the breach of the contract. Such a case should be submitted to a jury; under proper instructions all elements of the contract should be considered in determining the measure of damages.
(e) A decree in equity will not be refused, nor the contract held to be unconscionable because of reasons, arising after it was entered into, it became more burdensome than was anticipated. This is a correct statement of the law in a proper case, but the principle can not be held to extend to or confer on individuals or corporations legislative powers, nor can the power of the state be abridged by such contract.
(/) Does a decision of the Court of Appeals of Lucas County bind the Court of Common Pleas of Hamilton County the same as a decision of the Supreme Court of the state or the Court of Appeals of Hamilton County?
I can not agree with counsel as to the construction to be given to 'the constitutional amendment or the theory of government *407 as determined by the people in adopting this amendment to the Constitution, September 3, 1912. The provision referred to is:
Art. IV. Sec. 1. “The judicial power of the state is vested in a Supreme Court, courts of appeals, courts of common pleas, courts of probate .and such other courts inferior to the courts of appeals as may from time to time be established by law.”
The constitutional provision in force prior to 1912 was adopted by the people in 1883:
“The judicial power of the state is vested in a Supreme Court, circuit courts, courts of common pleas, courts of probate, justices of the peace and such other courts inferior to the Supreme Court as the General Assembly may from time to time establish. ’ ’
Both these provisions are limitations on the power of the General Assembly. Since 1912 the Legislature is prohibited from creating courts other than those inferior to the courts of appeals. Under the 1883 amendment a court might have been created superior or equal to the circuit court.
As I understand the letter and spirit of the amendment, it was, so far as controversies between litigants are concerned, there should be one trial and one review. As to such matter, the courts of appeals were constituted courts of last resort. The state reserved the power, when a question is presented to a local court that involves the inherent power of the state, the rights of the people either on a constitutional question or the inherent or implied powers of the state, that it should be finally determined by the Supreme Court. That is the tribunal removed from local environment, and was created for the purpose of representing the people of the state, and to safeguard the power and interest of the state itself.
It can not be that the determination of a question by the Court of Appeals of Lucas County was intended to bind the Court of Common Pleas of Hamilton County so that it would not be at liberty to express itself fully on any question.
A determination of a question by the Supreme Court, or Court of Appeals of Hamilton County binds this court. This is as it should be. Section 6 of Article IV of the Constitution is':
*408 "The courts of appeals shall have original jurisdiction * * * to review, affirm, modify, or reverse the judgments of courts of common pleas * * * and judgments of courts of appeals shall be final in all cases, except cases involving questions arising under the Constitution of the United States or of this state, eases of felony, cases of which it has original jurisdiction and cases of public or great general interest.”
This provision vests courts of appeals with the power stated over- judgments of common pleas courts in its district, not elsewhere.
A clear distinction is also made between cases of public interest, and cases of great general interest. This is a case of public interest. The power of the state is challenged.
This view is strengthened by the. following:
Section 6, Article IV, of the Constitution:
"And whenever the judges of a court of appeals find that a judgment upon which they have agreed is in conflict with a judgment pronounced upon the same question by any other court of appeals of the state, the judges shall' certify the record of the case to the Supreme Court for review- and final determination.”
The Supreme Court has passed on the question. In discussing the question of jurisdiction of courts of appeals it held that the only difference between the circuit court and court of appeals is in name. They say:
"A mere change of name of ,a court does not change the court, when the clear manifest constitutional purpose is to the contrary.” Mahoning Valley Ry. Co. v. Sautore, 93 O. S., 53.
It has held in a number of cases, that the decision of a circuit court of one district was not binding on a common pleas court in another district.
On the questions presented by counsel for defendants:
(a) That the contract is harsh, inequitable, unfair, against public interest and contrary to the public policy of the state as expressed in the Public Utilities Act, it seems that in so far as the questions involve the fixing of rates of fare, this court is without jurisdiction to pass on any of these questions.' The state has vested the rate regulation and making power in the *409 Public Utilities Commission. It has vested in it certain discretion. This court can not fix a rate, review one established, nor has it the jurisdiction to express an opinion as to the reasonableness or unreasonableness of any rate fixed according to law. The Public Utilities Commission has that power and discretion. The only review provided by the state from the act of the Public Utilities Commission is to the Supreme Court of the state.
But if I am in error in the view here expressed, and this court has jurisdiction to pass on a contract as to whether it is harsh, inequitable, unfair and against public policy, I call attention to the following cases:
“The city of Marshall agreed to give the Texas & Pacific Railway three hundred thousand dollars in county bonds, and sixty-six .acres of land within the city limits for shops and depots; and the company ‘in consideration of the donation’ agreed ‘to permanently establish its eastern terminus and Texas offices in the city of Marshall,’ and ‘to establish and construct at said city the main machine shops and car works of said railway company.’ The city performed its agreement, and the company, on its part, made Marshall its eastern terminus, and built depots and shops and established its principal offices there. After the expiration of a few years Marshall ceased to be the eastern terminus of the road, and some of the shops were removed. The city filed this bill in equity to enforce the agreement, both as to the terminus and as to the shops. Held: (1) That the contract on the part of the railway company was satisfied and performed when the company had established and kept its depot .and offices at Marshall, and had set in operation car works and machine shops there, and had kept them going for eight years and until the interest of the railway company and of the public demanded the removal of some or all of these subjects of the contract to other places; (2) And the word ‘permanent’ in the contract shall be construed with reference to the subject matter of the contract, and that under the circumstances of the case it was complied with by the establishment of the terminus and offices and shops contracted for, with no intention at the time of removing or abandoning them; (3) That if the contract were to be interpreted .as one to forever maintain the eastern terminus and the shops and Texas offices at Marshall, with regard to the convenience of the public it would become a contract that could not be enforced in equity. (4) The remedy of the city for the breach of contract, if there was ia breach, was at law.” Texas & Pacific Ry. Co. v. Marshall, 136 U. S., 393.
*410 Mr. Justice Miller delivering the opinion of the court further says:
“And we are further of the opinion, that if the contract is to be construed as the appellant insists it should be construed, it is not one to be enforced in equity.”
The subject of contract between a common carrier and an individual for a right-of-way over land was considered by the Supreme Court of the United States:
“A railroad company on receiving from the plaintiff a conveyance of and for its road agreed for itself and its .assigns not to build a depot within three miles of the one which it built on the land conveyed. Subsequently it sold its road to defendant which proposed to build a station within three miles, in pursuance, as was admitted, of an order of the state railroad commission.
“Held: That the injunction should not issue.
“Query: Whether the burden of the contract passed to defendants.
“Whether a railroad station should be built in a certain place is a question involving public interest.
“If it appears to the court that it would be against public policy to issue an injunction against a railroad Corporation the court may properly refuse to be made an instrument for such a result whatever the pleadings in the case may be.”
Mr. Justice Holmes in delivering the opinion uses this language :
“To compel the specific performance of a contract still is the exception, not the rule, .and courts should be slow to compel it in cases where it appears that permanent interest will or even may be interfered with by their action. It has been intimated by this court that a covenant much like the present should not be enforced in equity, and that the railroad should be left at liberty to follow the course which its best interests and those of the public demand.” Beasley v. Texas & Pacific Ry. Co., 191 U. S., 492.
(b) That the contract was in its inception invalid .as being ulira vires, and provided unfair, unreasonable discrimination as against the public in favor of the few persons specified in the contract. It seems to me that question was settled by the *411 case of the Union Pacific Ry. Co. v. The C. R. I. Ry. Co., which will be referred to later.
(c) On the question of ,an adequate remedy at law my views are fully stated above, and need not be here repeated.
The nominal consideration of the contract was one dollar. The consideration moving from the King Powder Company was the permission to the railway company to construct and operate its road over property owned by the powder company. The consideration moving from the railroad company was the construction and operation of the road and the rates of fare provided in the contract.
The property was subsequently deeded to the railroad company as is shown by the record. The railroad was constructed and operated, and is now being operated by the receiver. The rates of fare provided in the contract were given to the employees for about fifteen years.
Both parties to the contract dedicated the property to a public use. The Supreme Court of the United States has stated the law with reference to powers of government over property dedicated to a public use:
“Under the powers inherent in every sovereignty a government may regulate the conduct of its citizens towards each other, and when necessary for the public good the manner in which each shall use his own property.” Munn v. Illinois, 94 U. S., 113.
From the first colonization of this country the colonies and the states have regulated common carriers, ferriers, hackmen, bakers, millers, wharfingers, inn-keepers, etc.
The subject under consideration is a common carrier. The inherent power of the state to regulate common carriers implies that property devoted to such a use is subject to control and regulation by the state. The public has an interest in all such property, and one portion can not be “cut out” and receive consideration different from all the property of such corporation. It follows that at the time the land was contracted for and deeded to a corporation, dedicated to a public use, the grantee must have contemplated the laws of the state and its *412 inherent power and will be deemed to have submitted it to control and regulation by the state.
There can be no difference between property deeded to a company for public use and that appropriated under the power of eminent domain. The law provides that property can not be appropriated until after a failure to agree. It is the use to which the property is put that gives the state jurisdiction.
Plaintiff goes back of the deed and relies on the contract in pursuance of which the deed was executed .and delivered. Both the contract and the deed must have been executed in contemplation of the law of the state, and the inherent power of the .state over the grantee, the railroad company. The fact that the contract was valid when made can not affect the question. The question is one of power. The power of the state can not be abridged, controlled or superseded by private contract. The state had the power, and when it exercised it all rights and property were subject thereto.
This principle was well stated by the Supreme Court of Oregon:
“"Whenever an owner devotes his property to the use in which the public has an interest, he must submit to be regulated and controlled by the public for the common good.” Woodburn v. Public Utilities Commission, 82 Ore., 114.
Counsel for plaintiff contends that the law of Ohio is different from that stated, and relies on the ease of Taylor et al v. Niles, Receiver, 21 C.C.(N.S.), 391; 2 Ohio App., 293. As already pointed out; this court does not feel bound by the decision in that case. The question goes to the power of the state. It is one of public interest. The tribunal vested with the power to finally determine the question of public interest is the Supreme Court, and its determination alone is binding on the lower court. If the decision in the case of Taylor v. Niles is correct, it ultimately will be determined that way. I am of the opinion that that case does not correctly state the law. It may be that the considerations here expressed were not called to the court’s attention in that case.
Plaintiff further relies on the case of The Interurban Railway & Terminal Company v. City of Cincinnati, 93 O. S., 108. *413 In that case Judge Johnson of the Supreme Court of Ohio, in the opinion of the court makes it clear that the village of Pleasant Ridge in granting the franchise that became a contract, acted under and within the statutes passed by the state giving the municipality power to make such contracts. Whether the power of the state is such that it may by a repeal of the statute or the enactment of a law that supersedes such act set aside contracts made by its agents and subordinates is a question that need not be passed on at this time. The question in the Pleasant Ridge case was different from that in the case at bar. Judge Johnson calls attention to the following sections of the statutes, General Code, Sections 9100, 9104, 9113, 9117 to 9122, and adds:
“The acceptance of the grant by the company constituted a binding contract between the parties, and as long as the company retains the privileges and operates the railroad thereunder its terms are binding.”
On page 121 Judge Johnson uses this language:
“In the absence of statutory provision to the contrary, the village was empowered to stipulate, as one of the ‘terms and conditions’ which it was authorized to fix by the provisions of Section 3443, Revised Statutes, for a certain rate of fare for a road from any point in its limits to a point outside of its limits. ’ ’
The question in this case is, does the contract undertake to, or does it fix rates of fare that the state can not alter, regulate or control? It is contended that it is with reference to a certain class of individuals.
In passing on a contract between railroad companies, Chief Justice Fuller of the Supreme Court of the United States quotes with approval the following:
“Neither the form of expression on the one hand, nor the name on the other is conclusive. We must see what rights and privileges were in fact granted, what burdens and obligations assumed.” U. P. Ry. Co. v. C., M. & St. P. Ry. Co., 163 U. S., 582.
No act of the state through its Legislature or otherwise has been called to the court’s attention giving the parties to this *414 contract the power to enter into it. In the absence of such authority the parties to the contract in question could not be said to have entered into it without a knowledge of the laws of the state, or the inherent power of the state over common carriers.
The first act of the state exercising control over common carriers was passed February 11, 1848. The same power was exercised in 1852, 1872, 1873 and on numerous dates since. The acts specifically mentioned above were considered and sustained by the Supreme Court of Ohio in Smith v. P., Ft. W. & C. Ry. Co., 23 O. S., 10.
Coming to the question as to whether or not the Public Utilities Act of 1906 contravenes the guaranty of the Constitution of the United States that no state shall pass any law impairing the obligation of contract, the tribunal vested with power to finally determine the question of the constitutionality of an enactment of the state Legislature is the Supreme Court of the United States. That court has passed on a number of cases involving contracts entered into between railroad companies and other parties.
The Northern Pacific Company entered into a contract with the city of Duluth. The consideration for the contract was a cash payment by the railway company of $50,000. The city was to construct and keep in repair the viaduct and its approaches over Lake avenue, for a period of fifteen years. "Within that time the viaduct and its approaches heeame out of repair, the city called on the railway company to repair the same. It refused. Suit was filed by the city. The railroad company answered setting up its contract and made the same claim as presented in this case.
In Northern Pacific Ry. Co. v. State of Minnesota, ex rel City of Duluth, 208 U. S., 583, Mr. Justice Day says:
“The fallacy involved in the claim of the relator, and as we think, in some decisions, hy which its claim is supported, arises from a failure to distinguish between rights of property, which confessedly are protected under the Constitution from being divested or appropriated for other purposes without compensation, and the very different matter concerning the manner in which the owner may use his property so as not to unnecessarily endanger the public.”
*415 After citing a number' of cases, Mr. Justice D,ay continues:
“The result of these eases is to establish the doctrine of this court to be that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not violative of property rights protected by the Federal Constitution.
“In this case the Supreme Court of Minnesota has held that the charter of the company, as well as the common law, requires the railroad company as to existing and future streets, to maintain them in safety, and to hold its charter rights subject to the exercise of the legislative power in its behalf, and that any .contract which undertook to limit the exercise of this right was without consideration, against public policy and void. This doctrine is entirely consistent with the principles decided in the eases referred to in this court. But it is alleged that at the time this contract was made with the railroad company, it was at least doubtful as to what the rights of the parties were, and that the contract was a legitimate compromise ■between the parties, which ought to be carried out. But the exercise of police power can not be limited by contract, for reasons of public policy. Nor can it be destroyed by compromise, and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the state or the municipality to abridge this power, so necessary to public safety.”
Other authorities supporting this doctrine are: Ry. Co. v. Woodenware Co., 158 Wis., 130; Raymond Lumber Co. v. Raymond Light & Water Co., 92 Wash., 330; Seaman v. Ry. Co., 127 Minn., 180; Woodburn v. Public Service Commission, 82 Ore., 114; Portland Ry. Co. v. Oregon Ry. Commission, 229 U. S., 397, 412; State, ex rel Wubster, v. Superior Court, 97 Wash., 37; Home Telephone Co. v. Los Angeles, 211 U. S., 271; Manigault v. Springs, 199 U. S., 473, 480; Buffalo East Side R. R. Co. v. Buffalo St. Ry. Co., 111 N. Y., 130; Ry. Co. v. Nebraska, 170 U. S., 67.
The other question to be considered is, if under the police power, the state has the inherent, continuing power to fix and regulate rates of transportation, was the contract void when entered into, or did it become non-enforcible after the state had legislated on the subject-matter of the contract?
*416 It seems to me that under the decision of Justice Fuller, the subject-matter of the contract in this controversy is rates of fare.
Plaintiff contends that the rates of transportation fixed by Schedule 30 of the record is the act of the defendant. The power to regulate* and control rates of transportation on common carriers is vested in the state. The state by its duly constituted legislative authority has created the Public Utilities Commission with power to review, determine and, if it is found that the rate fixed by the railway company is unjust, oppressive or discriminatory, that it may itself fix a rate. If either the public or the railway company is not satisfied with the conclusion of the Public Utilities Commission, an appeal is provided to the Supreme Court of the state. Therefore, this court in passing on the contract can not pass upon the question of the reasonableness, or whether the contract discriminates between certain persons and certain employes, or whether the rate is just to the public and to the railway company. The only question for this court is, whether or not the contract does fix a rate of fare, and whether by fixing a rate of fare the contract can supersede the authority of the state to regulate or control a rate fixed by the Public Utilities Commission. Whether this is a special contract rate as provided in Section 513 of the General Code, is not a question for this court.
It is not necessary to cite authorities to establish the position that a contract can not supersede or overthrow the power.vested in the Legislature.
It seems, from a review of the authorities:
1st. That the act of the state of Ohio creating the Public Utilities Commission, when considered in connection with the contract sued on in this case, does not contravene the Constitution of the United States.
2d. That the contract in question can not be enforced in equity against the receivers.
3d. And that if the receivers had not been appointed it could not be enforced against the company.
The plaintiff’s petition will therefore be dismissed at its costs.