Argued October 10, reversed December 5, 1916.

## WOODBURN v. PUBLIC SERVICE COMMISSION.*

(161 Pac. 391.)

Constitutional Law—Police Power.

1. When an owner devotes his property to a use in which the public has an interest, he must submit to be regulated and controlled by the public for the common good.

Public Service Commissions—Regulation of Rates.

2. The regulation of rates for the purpose of promoting the public health, comfort, safety and welfare is an exercise of the police power of the sovereign.

[As to validity of regulation by public service commission fixing minimum rates to be charged by public service corporation, see note in Ann. Cas. 1916A, 933.]

Constitutional Law—Impairment of Contracts—Telephone Rates.

3. If a telephone company's franchise from a city, limiting rates to be charged, is deemed a contract, the mere fact that it was made prior to the enactment of the Public Utility Act (Laws 1911, p. 483), and before the state attempted to regulate such rates, does not debar the state from increasing the rates as fixed in the franchise, because when the state exercises its police power, it does not work any impairment of obligation of the contract; the possibility of the exercise of such power being an implied term of the contract.

Constitutional Law—Rate-fixing Power—Delegation to Municipality.

4. Since the right to regulate rates is an inherent element of sovereignty, such right can be delegated to a municipality only by clear

*On the power of legislature to fix tolls, rates or prices of public service corporations, see comprehensive note in 33 L. R. A. 177.

On right to reduce rates of public service corporation fixed by franchise, see note in L. R. A. 1915C, 261, 287.    REPORTER.

and express terms, and all doubts must be resolved against the municipality.

**Municipal Corporations—Legislative Control—Home Rule Charter.**

5.  Article XI, Section 2, of the Constitution, providing that the legal voters of every city and town are granted power to enact and amend their municipal charter subject to the Constitution and criminal laws of the State of Oregon, and forbidding the legislative assembly to amend or repeal any charter for any municipality, etc., does not extend the authority of such municipalities over subjects not properly municipal and germane to the purposes for which municipal corporations are formed.

**Municipal Corporations—Regulation of Rates.**

6.  The right to regulate rates is a matter of general concern, and does not pertain solely to municipal affairs.

**Telegraphs and Telephones—Regulation by Municipality—Regulation by State.**

7.  Where a municipality under its home rule charter, adopted under Article XI, Section 2, of the Constitution, granted a telephone franchise limiting rates to be charged, and later the Public Utility Act (Laws 1911, p. 483), was enacted, the Public Service Commission had authority thereunder to authorize the company to charge higher rates.

**Telegraphs and Telephones—Regulation—Public Service Commission.**

8.  The failure of the Public Service Commission to file a statement of valuation mentioned in Section 10 of the Public Utility Act (Laws 1911, p. 483), does not affect the validity of an order, allowing a telephone company to charge higher rates than those stated in its franchise, since the right to make the order does not depend upon filing the statement of valuation, and, in any event, under direct provision of Section 75 of the act, technical omissions are immaterial.

From Marion: WILLIAM GALLOWAY, Judge.

In Banc.    Statement by MR. JUSTICE HARRIS.

The City of Woodburn was incorporated by an act of the legislative assembly in 1889; but, on June 30, 1909, the legal electors of the city exercised the right of home rule conferred by Article XI, Section 2, of the state Constitution, and amended their charter by enacting that the common council shall have authority:

"To grant franchises in, through and upon the streets of the city for public uses and public benefits"; and "to regulate and control or prohibit the placing of poles for electric lights or other purposes, and the suspension of electric and other wires along on cross-streets of said city, and to require any or all already

placed or suspended, either in limited districts or throughout the entire city, to be removed, or to be placed in such manner as it may designate beneath the surface of the streets or sidewalks.''

In October, 1910, the common council granted by ordinance, and the United Telephone Company accepted,, a franchise which permitted the company and its successors to construct and maintain telephone poles and wires along the streets of Woodburn. One section of the franchise fixed the monthly maximum rates to be charged for telephones. A telephone plant was installed by the United Telephone Company, but afterward the franchise and plant owned by it were transferred to the Western Telephone Company, a corporation, and the present owner. The company has extended its lines beyond the boundaries of Woodburn,. and it renders service to patrons who reside without,. as well as to customers who live within, the city limits. In July, 1915, the Western Telephone Company applied to the Public Service Commission for permission to increase the telephone rates. After giving due notice to both the company and the city, a public hearing was held, and the Commission ordered that the company be permitted to increase its rates on condition that the applicant avoid duplication by effecting a consolidation of its system with a competing telephone plant, which was then occupying the same territory. The two telephone plants were consolidated, and then on December 1, 1915, the Public Service Commission directed that the Western Telephone Company charge a specified schedule of rates. The charges specified in this schedule were greater than the rates fixed in the franchise, and for that reason the city then commenced a suit to vacate the order made by the Public Service Commission, and to enjoin the Western Telephone Company from charging any greater rates than

those named in the franchise which had been granted by the City of Woodburn. After a trial the Circuit Court vacated the order of the commission, and enjoined the company from exacting any charges in excess of the amounts specified in the franchise. Both the Public Service Commission and the Western Telephone Company appealed.  REVERSED.

For appellant, Western Telephone Company, there was a brief over the name of *Messrs. John H. & Charles L. McNary,* with an oral argument by *Mr. Charles L. McNary.*

For appellant, the Public Service Commission, there was a brief over the names of *Mr. John O. Bailey,* Assistant Attorney General, and *Mr. George M. Brown,* Attorney General, with an oral argument by *Mr. Bailey.*

For respondent there was a brief with oral arguments by *Mr. George G. Bingham* and *Mr. Blaine McCord.*

MR. JUSTICE HARRIS delivered the opinion of the court.

The decree appealed from is predicated upon the argument that the Public Service Commission was without power to permit the telephone company to charge urban customers more than the rates named in the franchise, which the city had granted prior to the creation of the Public Service Commission. Before proceeding with the discussion, attention will be called to some of the provisions of the legislation which was designed to clothe the commission with authority to fix the rates to be charged for telephone service. An act to define public utilities and to provide for rate regulation was passed by the legislative assembly in

1911 (Laws 1911, p. 483); but upon the filing of a petition in the office of the Secretary of State the measure was referred to the legal voters of the state at the regular general election on November 5, 1912, when they approved the act by a majority vote, and afterward on November 29, 1912, the Governor proclaimed that the measure was the law of the state: Laws 1913, p. 9. The Public Utility Act is similar to the legislation which has been adopted in most of the states, and confers upon the commission the power to regulate telegraph, telephone, street railroad, heat, light, water, and power plants so that a safe and adequate service may be rendered to the public at reasonable and sufficient rates. The term "public utility" embraces every owner operating a telephone plant for the public "and whether said plant or equipment or part thereof is wholly within any town or city, or not": Section 1. Power to regulate public utilities is conferred upon a commission which was, at that time, called the Railroad Commission of Oregon (Section 6), but is now known as the Public Service Commission of Oregon: Laws 1915, p. 347. Every public utility is required to furnish adequate and safe service, and unjust or unreasonable charges are prohibited. The commission may hold a hearing (Section 42), on the complaint of patrons that the rates being charged are unreasonable or unjustly discriminatory (Section 41), or on the complaint of any public utility "as to any matter affecting its own product or service" (Section 46), or an investigation may be made on the motion of the commission (Section 45); and "if upon such investigation, any rates * * shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory * * the commission shall have power to fix and order substituted therefor such rate or rates, * * as shall be just and

reasonable * * '' (Section 43) ; and, furthermore, the commission ''shall determine and by order fix reasonable rate or rates, * * in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory * * (Section 51). The power of a municipality to regulate utilities is provided for by Section 61 which declares that:

''Every municipality shall have power—(1) To determine by contract, ordinance or otherwise the quality and character of each kind of product or service to be furnished or rendered by any public utility furnishing any product or service within said municipality and all other terms and conditions not inconsistent with the act upon which such public utility may be permitted to occupy the streets, highways or other public property within such municipality and such contract, ordinance or other determination of such municipality shall be in force and *prima facie* reasonable. Upon complaint made by such public utility or by any qualified complainant as provided in Section 41, the commission shall set a hearing as provided in Section 42 and if it shall find such contract, ordinance or other determination to be unreasonable, such contract, ordinance or other determination shall be void. Provided, however, that no ordinance or other municipal regulation shall be reviewed by the commission under the provisions of this section which was prior to such review enacted by the initiative or which was prior to such review referred to and approved by the people of said municipality or while a referendum thereon is pending.''

In brief, the facts present a situation where the legal voters of the city amended their municipal charter and conferred upon the common council authority to grant franchises in the streets for public benefits; the council exercised this chartered power, and granted a franchise to a telephone company, the rates to be charged to be fixed by the terms of the franchise; subsequently

the Public Utility Act was passed by the legislative assembly, and then referred to all the voters of the state, who approved the measure at a general election; and, finally, upon the application of the telephone company, the Public Service Commission, acting under the authority of the Public Utility Act, specified a schedule of rates to be charged by the telephone company, and the city is now complaining because those rates exceed the charges fixed in the franchise.

The ultimate question for decision is whether the Public Service Commission was lawfully empowered to specify rates different from those fixed by the terms of the franchise. Throughout the discussion it must be borne in mind that the state, acting through the Public Service Commission, is a party to this suit, and consequently judicial precedents, arising out of controversies between none but the immediate parties to a franchise, are not controlling here. Moreover, the present juncture does not call for a decision of the relative rights of the grantor and grantee of a franchise as between themselves. Furthermore, the very purpose of this litigation is to determine whether the state has in fact empowered Woodburn to fix a schedule of rates which the state could not afterward change, and hence we must also distinguish all those judicial utterances which followed a finding that the state had actually conferred upon a city the power unalterably to fix the rates to be charged by the grantee of a franchise.

1, 2. Power to govern men and things is inherent in government, and when an owner devotes his property to a use in which the public has an interest, he must submit to be regulated and controlled by the public for the common good: *Munn* v. *Illinois,* 94 U. S. 113 (24 L. Ed. 77) ; *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389 (58 L. Ed. 1011, L. R. A. 1915C, 1189, 34 Sup.

Ct. Rep. 612).   The right to regulate the rates to be charged by a public utility inheres in the power to govern.   The regulation of rates for the purpose of promoting the health, comfort, safety and welfare of society is an exercise of the police power, and is therefore an attribute of sovereignty: *Hudson Water Co.* v. *McCarter,* 209 U. S. 349 (52 L. Ed. 828, 14 Ann. Cas. 560, 28 Sup. Ct. Rep. 529); *Yeatman* v. *Towers,* 126 Md. 513 (95 Atl. 158); *Benwood* v. *Public Service Com.,* 75 W. Va. 127 (83 S. E. 295, L. R. A. 1915C, 261); *State ex rel. Webster* v. *Superior Court,* 67 Wash. 37 (120 Pac. 861, L. R. A. 1915C, 287, Ann. Cas. 1913D, 78); *Idaho Power & Light Co.* v. *Blomquist,* 26 Idaho, 222 (141 Pac. 1083, Ann. Cas. 1916E, 282). Being an inherent element of sovereignty, the whole sum of this police power may, for the purposes of this suit, be regarded as having been primarily and originally lodged in the state; and, without attempting to decide whether the state can relinquish any part of the police power to cities so as to be deprived of the right to resume the relinquished power, we shall now seek to ascertain whether the police power, to the extent of the right to regulate rates, passed from the sovereignty when the franchise was accepted by the telephone company.   The inquiry involves two general questions: (1) The effect of the franchise when considered by itself; and (2) the result effected by the franchise when considered with relation to the city and state.

3. If the franchise is deemed to be a contract between the city and telephone company, then the mere fact that it was made prior to the enactment of the public utility statute and before the state attempted to regulate the rates, does not debar the state from increasing the rates fixed in the contract between the parties, for the reason that the law wrote into it a

stipulation by the city that the state could, at any time, exercise its police power and change the rates; and therefore, when the state does exercise its police power, it does not work an impairment of any obligation of the contract. The immediate parties to the franchise must contract with reference to the right of the government to exercise its inherent authority. The governed cannot, by contract, forestall the resuscitation of a dormant police power by the government; and therefore, unless the state actually divested itself of the right to exercise its police power, the agreement by which the city and company specified the rates was made subject to the right of the state to change them: *Louisville & Nashville R. R.* v. *Mottley,* 219 U. S. 467 (57 L. Ed. 297, 34 L. R. A. (N. S.) 671, 31 Sup. Ct. Rep. 265); *Union Dry Goods Co.* v. *Georgia Pub. Service Corp.,* 142 Ga. 841 (83 S. E. 946); *Yeatman* v. *Towers,* 126 Md. 513 (95 Atl. 158); *Minneapolis St., P. & S. S. M. Ry. Co.* v. *Menasha W. W. Co.,* 159 Wis. 130 (150 N. W. 411, L. R. A. 1915F, 732); *Portland R. L. & P. Co.* v. *Railroad Com. of Oregon,* 229 U. S. 397 (57 L. Ed. 1248, 33 Sup. Ct. Rep. 820); *Hudson Water Co.* v. *McCarter,* 209 U. S. 349 (52 L. Ed. 828, 14 Ann. Cas. 560, 28 Sup. Ct. Rep. 529); *Benwood* v. *Public Service Commission,* 75 W. Va. 127 (83 S. E. 295, L. R. A. 1915C, 261); *State ex rel. Webster* v. *Superior Court,* 67 Wash. 37 (120 Pac. 861, L. R. A. 1915C, 287, Ann. Cas. 1913D, 78).

4. We now come to a consideration of the result brought about by the franchise when viewed in connection with the authority of the city and state. The city argues that Article XI, Section 2, of the state Constitution granted to Woodburn, and at the same time took from the legislative assembly, the right to legislate concerning the regulation of rates. When exam-

ining the contention urged by the municipality, we must not lose sight of the fact that the right to regulate rates by changing them from time to time as the welfare of the public may require is essentially a police power; and, since the right to regulate rates is an inherent element of sovereignty, when seeking to ascertain whether this part of the police power has been conferred upon the city, either with or without limitation, we are constantly governed by the rule that the delegation of the sovereign right to regulate rates must be clear and express, and all doubts must be resolved against the city: *Home Telephone Co.* v. *Los Angeles,* 211 U. S. 265 (53 L. Ed. 176, 29 Sup. Ct. Rep. 50); *Milwaukee Elec. Ry.* v. *Wisconsin R. R.   Com.,* 238 U. S. 174 (59 L. Ed. 1254, 35 Sup. Ct. Rep. 820); *Benwood* v. *Public Service Commission,* 75 W. Va. 127, (83 S. E. 295, L. R. A. 1915C, 261); *State ex rel. Webster* v. *Superior Court,* 67 Wash. 37 (120 Pac. 861, Ann. Cas. 1913D, 78, L. R. A. 1915C, 287); *City of Manitowoc* v. *Manitowoc & Northern Traction Co.,* 145 Wis. 13 (129 N. W. 925, 140 Am. St. Rep. 1052).   Quoting from *Charleston Consol. Ry. & Lighting Co.* v. *City Council,* 92 S. C. 127 (75 S. E. 390):

"The state's power to regulate by compulsion the charges of public service corporations is one of such vast and increasing importance to the public that the courts will not attribute to the state the intention to part with it or to delegate it unless the intention is clearly and unmistakably expressed."

Unless the right to exercise the police power of regulating rates is referable to an unmistakable grant, the prices specified in the franchise are not exempted from interference by the legislative assembly.   The city is relying upon Article XI, Section 2, of the state Con-

stitution as amended in 1906, and, which, so far as it is now material, is here quoted:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend, or repeal any charter or act of incorporation for any municipality, city, or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon. * * "

Much of the printed brief submitted for the Public Service Commission is devoted to an argument that the legislative assembly is not prohibited from enacting any general law, though it has the effect of amending city charters. The instant controversy, however, does not make it necessary to determine whether the legislative assembly is prohibited from passing general, as well as special, laws which affect city charters; and hence, waiving the question and without attempting to foreclose debate, it will be assumed that this investigation is governed by the prevailing opinion in *Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22, Ann. Cas. 1916E, 1051), where a majority of the court ruled that the legislative assembly is prohibited by Article XI, Section 2, of the state Constitution from amending city charters by special or by general laws.

5. While the Constitution grants to a city the right to enact and amend its charter and simultaneously prohibits the legislative assembly from enacting, amending or repealing any charter for any city, nevertheless, neither the grant nor the prohibition includes any subjects except those "that are purely local and municipal in character" (*Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22, Ann. Cas. 1916E, 1051), or, as is stated in *Branch* v. *Albee,* 71 Or. 188, 205 (142

Pac. 598), the authority of the cities is not extended "over subjects that are not properly municipal and germane to the purposes for which municipal corporations are formed. We use the word 'municipal' as signifying what belongs to a city."

In *Coleman* v. *La Grande*, 73 Or. 521, 525 (144 Pac. 468, 470), this court ruled that:

"By granting and reserving to the people of municipalities the power to enact and amend their charters and adopt local or special laws, the state has not surrendered her sovereignty to the municipalities. Within their boundaries cities are clothed with power to regulate matters purely local. However, a city is not constituted as a sovereignty as regards all matters of legislation, but is still to a certain extent a mere agency of the state of which it is a part. Beyond such municipal boundaries and in matters of general concern not pertaining solely to local municipal affairs, cities are amenable to the general laws of the state, which do not infringe upon the right of cities to local self-government. This is so whether such laws are enacted by the legislature or by the people of the state at large."

6. The right to regulate rates is a matter of general concern, and does not pertain solely to local municipal affairs: *Portland Ry., Light & Power Co.* v. *City of Portland* (D. C.), 210 Fed. 667. It is true that the regulation of the rates for telephones in Woodburn may not immediately affect the pocketbooks of all the people of the whole state any more than does the prosecution of a person in a Justice Court for assault and battery, when taken alone and by itself, directly affect all the people of the whole state, and yet the state is just as much interested in promoting the comfort and general welfare of all the people as in preserving peace for all the people. In these modern times, when the activities of public utilities are not always confined to

a single city, the people are especially concerned in the retention of the right to adjust rates to changing conditions, so that no person may be discriminated against and all may receive adequate service at reasonable rates, and at the same time affording sufficient returns to the public utility. The state guards its right to regulate rates so vigilantly that specific authority is necessary to compel a surrender of this element of sovereignty and in the language of the Supreme Court of the United States:

"The general powers of a municipality or of any other political subdivision of the state are not sufficient": *Home Telephone Co.* v. *Los Angeles,* 211 U. S. 265 (53 L. Ed. 176, 29 Sup. Ct. Rep. 50); *Milwaukee Elec. Ry.* v. *Wisconsin R. R. Com.,* 238 U. S. 174 (59 L. Ed. 1254, 35 Sup. Ct. Rep. 820).

The power to regulate rates does not appertain to the government of a city; it is not municipal in character; nor is it even an incident to a grant of authority to enact or amend a charter for a city or town: *State ex rel. Webster* v. *Superior Court,* 67 Wash. 37 (120 Pac. 861, Ann. Cas. 1913D, 78, L. R. A. 1915C, 287). The language appearing in *State ex rel. Garner* v. *Missouri & K. Telephone Co.,* 189 Mo. 83 (88 S. W. 41), is peculiarly applicable here, and for that reason we quote extensively from the reported opinion:

"Until the adoption of our Constitution in 1875 all cities in the state derived their charter powers from the General Assembly, and therefore whatever was contained in a city charter had the full force of a legislative enactment. But under that Constitution cities of certain descriptions were authorized to frame their own charters. A charter, framed under that clause of the Constitution within the limits therein contemplated has a force and effect equal to one granted by an act of the legislature. But it is not every power that may be essayed to be conferred on the city by

such a charter that is of the same force and effect as
if it were conferred by an act of the General Assembly,
because the Constitution does not confer on the city
the right * * to assume all the powers that the state
may exercise within the city limits, but only powers
incident to its municipality, yet the legislature may,
if it should see fit, confer on the city powers not neces-
sary or incident to the city government.  There are
governmental powers, the just exercise of which is es-
sential to the happiness and well-being of the people
of a particular city, yet which are not of a character
essentially appertaining to the city government.
Such powers the state may reserve to be exercised by
itself, or it may delegate them to the city, but until so
delegated they are reserved.  The words in the Con-
stitution, 'may frame a charter for its own govern-
ment,' mean may frame a charter for the government
of itself as a city, including all that is necessary or
incident to the government of the municipality, but not
all the power that the state has for the protection of
the rights and regulation of the duties of the inhabit-
ants in the city, as between themselves. * * The regu-
lation of prices to be charged by a corporation in-
trusted with a franchise of a public utility character
is within the sovereign power of the state that grants
the franchise or that suffers it to be exercised within
its borders, and that power may be, with wisdom and
propriety, conferred on a municipal corporation, but
it is not a power appertaining to the government of
the city, and does not follow as an incident to a grant
of power to frame a charter for a city government''

7. The right of the state to regulate rates by compul-
sion is a police power, and must not be confused with
the right of a city to exercise its contractual power to
agree with a public service company upon the terms of
a franchise.  The exercise of a power to fix rates by
agreement does not include or embrace any portion of
the power to fix rates by compulsion.  When Wood-
burn granted the franchise to the telephone company,

the city exercised its municipal right to contract, and it may be assumed that the franchise was valid and binding upon both parties until such time as the state chose to speak; but the city entered into the contract subject to the reserved right of the state to employ its police power and compel a change of rates, and when the state did speak, the municipal power gave way to the sovereign power of the state: *Benwood* v. *Public Service Commission*, 75 W. Va. 127 (83 S. E. 295, L. R. A. 1915C, 261); *State ex rel. Webster* v. *Superior Court*, 67 Wash. 37 (120 Pac. 861, Ann. Cas. 1913D, 78, L. R. A. 1915C, 287; *City of Monroe* v. *Detroit M. & T. S. L. Ry.*, 187 Mich. 364 (153 N. W. 669); *City of Manitowoc* v. *Manitowoc & Northern Traction Co.*, 145 Wis. 13 (129 N. W. 925, 140 Am. St. Rep. 1056); *Charleston Consol. Ry. & Lighting Co.* v. *City Council*, 92 S. C. 127 (27 S. E. 390); *Duluth St. Ry. Co.* v. *Railroad Commission*, 161 Wis. 245 (152 N. W. 887); *California-Oregon Power Co.* v. *City of Grants Pass* (D. C.), 203 Fed. 173. Other instructive cases are: *Borough of North Wildwood* v. *Board of Pub. U. Commrs.*, 88 N. J. Law, 81 (95 Atl. 749); *Worcester* v. *Street Ry. Co.*, 196 U. S. 539 (49 L. Ed. 591, 25 Sup. Ct. Rep. 327); *City of Dawson* v. *Dawson Telephone Co.*, 137 Ga. 62 (72 S. E. 508); *City of Kenosha* v. *Kenosha Home Telephone Co.*, 149 Wis. 338 (135 N. W. 848); *Borough* v. *Ohio Valley Water Co.*, 245 Pa. 114 (91 Atl. 236); *Phillipsburg* v. *Board of Pub. U. Commrs.*, 85 N. J. Law, 141 (88 Atl. 1096).

The power to fix rates by compulsion as distinguished from the power to fix rates by agreement is not granted to cities or towns, nor is the right of the legislative assembly to legislate upon that subject curbed, by Article XI, Section 2, of the state Constitution because in its essence it is neither a municipal power nor an incident to a pure municipal power, and

therefore, even under the rule announced by the majority opinion in *Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22, Ann. Cas. 1916E, 1051), the legislative assembly was not prohibited from making the Public Utility Act applicable to urban as well as extraurban territory. The defendants have vigorously contended that approval of the Public Utility Act by the vote of the people made the measure valid even though it be conceded that the act would be invalid without the approval of the electorate. It will not be necessary, however, to decide whether a measure passed by the legislative assembly is validated when referred to the people and approved by them, when in the absence of such reference and approval the measure would be invalid because of the prohibition contained in Article XI, Section 2; and we therefore leave this question open for future consideration.

The city has limited the inquiry to the question of whether the commission possessed the necessary power to change rates, and hence we are not now concerned with the amount or reasonableness of the rates. Our conclusion is that the Public Service Commission, as the representative of the state, had lawful authority to change the telephone rates.

8. Any failure of the commission to file the statement of valuation mentioned in Section 10 does not affect the validity of the order involved in the appeal. The right to make the order did not depend upon filing the statement of valuation with the city recorder; and, moreover, Section 75 of the Public Utility Act provides that no order of the commission shall be declared illegal "for any omission of a technical nature in respect thereto."

The decree of the Circuit Court is reversed and the suit is dismissed. REVERSED. SUIT DISMISSED.