O’NIELL, J.
The question propounded in this case is whether the authority to fix the rate of' car fare on street railways in the city of New Orleans is vested in the municipal council or in the Louisiana Public Service Commission.
The Attorney General has appealed from a judgment dismissing this suit for an injunction, on behalf of the state, to prevent the municipal council from making an agreement with the New Orleans Railway & Light Company, permitting the collection of a higher rate of ear fare than the five-cent rate fixed in the original franchises held by the company.
The Louisiana Public Servicé Commission was created by section 3 of article 6 of the Constitution of 1921, as the successor of the Railroad Commission of Louisiana. The authority of the new commission, however, was extended so as to give it the power of supervision, regulation and control over local public utilities — specifically, street railways, gas, electric light, heat, power, and waterworks. The commission’s predecessor, the Railroad Commission of Louisiana, did not have any power of supervision, regulation, or control, over local public utilities, its power of supervision, regulation and control, having been confined to railroads, steamboats and 'other water craft, sleeping car, passenger and freight tariffs and service, express rates, and telephone and telegraph charges. Article 284 of the Constitution of 1898 and of 1913.
Section 4 of article 6 of the Constitution of 1921, giving the new Public Service Commission authority to fix rates, fares, tolls and charges of public utilities — local as well as state-wide — is qualified by the expression *27 “except as herein otherwise provided.” And section 7 of the same article declares that “the powers of supervision, regulation and control over any street railway, gas, electric light, heat, power, waterworks, or other local public utility, now vested in any town, city, or parish government,” shall not be vested in or exercised by the Public Service Commission, unless or until a majority of the qualified electors of such town, city or parish, voting at an election to be held pursuant to laws to be enacted by the Legislature, shall vote to surrender such powers. No such election has been held in New Orleans. Therefore, if the municipal government had the authority to fix the rates, fares, tolls, and charges of local public utilities, immediately before the Constitution of 1921 was adopted, and if the language of the reservation in section 7 of article 6 reserving to all municipal governments that already had such powers “the powers of supervision, regulation and control” over local public utilities, is comprehensive and specific enough to include the power to fix rates the municipal council has that exclusive power now.
The argument of the Attorney General, in support of his contention that the municipal council has not the rate-making authority over street railways, is twofold. He contends: First, that the municipal council did not have the rate-making authority when or before the Constitution of 1921 was adopted; and, second, that the reservation in section 7 of article 6, of “the powers of supervision, regulation and control” over local public utilities, does not include the authority to fix rates, fares, tolls or charges. It is conceded, in plaintiff’s petition and in the Attorney General’s argument, that the municipal council did have authority to fix the rate of car fare when the franchises now held by the New Orleans Railway & Light Company were originally granted, fixing the fare at five cents. It is said that the authority to grant those franchises, and to fix the rate of car fare, was given specifically, by special acts of the Legislature. We are referred to section 21 of Act 20 of 1882, one of the charters granted to the city of New Orleans; section 4 of Act 135 of 1888, being an amendment of the city’s charter; section 87 of Act 45 of 1896, another city charter; and Act 108 of 1902, being an amendment of sections 86 and 87 of Act 45 of 1896. The statutes cited merely prescribed the forms which the municipal council was required to observe, such as the publication of the terms, conditions and specifications, before granting any franchise for a street railway or other local public utility. The statutes did not, in terms, confer upon the municipal council the power to fix the rates, fares, tolls, or charges, to be collected by the grantees of such franchises. It appears to have been assumed by the Legislature, and by the municipal council, that the authority to grant franchises for street railways or other local public utilities included the authority to fix the rates, fares, tolls or charges, to be collected by the grantees of such franchises.
It is not pretended that the Legislature has deprived the municipal council of its rate-making authority over street railways or other local public utilities, since the franchises which are the subject of this litigation were originally granted by the municipal council. The Legislature attempted to deprive the municipal council of that authority by the Act 36 of 1916, undertaking to amend the charter of the city by creating a local board of public utilities, four of the five members of which were to be appointed by the Governor of the state. But the statute was unconstitutional, and was so declared in the case of Board of Public Utilities v. New Orleans Railway & Light Co., 145 La. 308, 82 South. 280. The attempt of the Legislature to create a board of public utilities for the city of New Orleans, and to confer upon the board the power of supervision, regulation and control, including the rate-making power, *29 over street railways and other local public utilities, signifies very forcibly that the Legislature recognized that the municipal council was then exercising that authority, and that it required an act of the Legislature to stop it.
The charter of the city of New Orleans, Act 159 of 1912, establishing the commission form of government, as amended by Act 21 of the extra session of 1917 and by Act 29 of 1918 — as it was when the Constitution of 1921 was adopted — contains the following provisions, under which the municipal council now claims authority to fix the rates, fares, tolls and charges, for local public utilities, viz.:
“Section 1. * * * That all the inhabitants of the parish of Orleans, * * * are hereby created a body corporate and established as a political corporation, by the name of ‘the City of New Orleans,’ with the following powers: * * * “(d) The legislative, executive and judicial powers of the city shall extend to all matters of local and municipal government, it being the intent thereof, that the specifications of particular powers by any other provision of this charter shall never be construed as impairing the effect of the general grant of powers of local government hereby bestowed;
“(e) The city shall also have all powers, privileges, and functions which, by or pursuant to the Constitution of this state, have been, or could be granted to or exercised by any city.” * * *
“Section 8. The commission council shall have also power: * * *
“12. To authorize the use of the streets for railroads operated by horse, electricity, steam or motive power, and to regulate the same; to require and compel all lines of railway or tramway in any one street to run on and use one and the same track and turntable, to compel them to keep conductors on their cars, and to compel all such companies to keep in repair the streets, bridges and crossings through or over which their cars run.
“13. * * * And to exercise general police power in the city of New Orleans.”
The foregoing provisions of the charter of 'the city of New Orleans leave nothing for interpretation. Paragraph (d) of section 1 admonishes us not to interpret or construe a specification of any particular power conferred upon the municipal government as a limitation or impairment of the general powers of local government granted by the charter. And the next following paragraph of the same section declares, in language as plain and unmistakable as could possibly have been used, that the municipal government has all of the powers and privileges and functions that the Legislature has granted or could grant to any city government, or that could be exercised by any city government. Jt cannot be disputed that the rate-making authority over street railways and other local public utilities is one of the powers, privileges and functions that could have been granted to and exercised by the municipal council of New Orleans, or of any other city.
[1] The rate-making authority over public utilities is an attribute of sovereignty, inherent in the state, as an element of her police power. It has been decided, in those states where, as in Louisiana, the Constitution forbids an abridgment of -the police power of the state, particularly in Missouri, South Dakota, California, Pennsylvania, Montana and Mississippi, that the Legislature cannot surrender irrevocably or bargain away the authority to fix or control rates for public utilities. State v. Public Service Commission, 275 Mo. 201, 204 S. W. 499 ; Chicago & Alton Railroad Co. v. Tranbarger, 238 U. S. 67, 35 Sup. Ct. 678, 59 L. Ed. 1204 ; Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 34 Sup. Ct. 364, 58 L. Ed. 721 ; Lake Shore & Michigan Southern Railway Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702 ; C., B. & Q. Railway Co. v. Illinois, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175 ; Bacon v. Walker, 204 U. S. 311, 27 Sup. Ct. 289, 51 L. Ed. 499 ; City of Lead v. Gas Co. (S. D.) 184 N. W. 244, overruling Watertown v. Watertown, etc., Co., 42 S. D. 220, 173 N. W. 739 ; City of San Antonio v. San Antonio Public Service Co., *31 255 U. S. 547, 41 Sup. Ct. 428. 65 L. Ed. 777 ; City of Scranton v. Public Service Commission, 268 Pa. 192, 110 Atl. 775 ; City of Woodburn v. Public Service Commission of Oregon et al., 82 Or. 114, 161 Pac. 391, L. R. A. 1917C, 98, Ann. Cas. 1917E, 996 ; O’Keefe v. City of New Orleans (D. C.) 273 Fed. 560.
By the same token, it has been decided that a municipality invested with authority to grant franchises and fix rates for local public utilities cannot irrevocably surrender or barter away its police power in that respect, even for a limited term, unless, perhaps, the munieiijality is specifically authorized to make such binding or irrevocable contract, by the Legislature of a state whose Constitution allows it, as in Ohio State Public Utilities Commission ex rel. v. City of Quincy, 290 Ill. 360, 125 N. E. 374 ; Board of Survey of Arlington v. Bay State Str. Ry. Co., 224 Mass. 463, 113 N. E. 273, 5 A. L. R. 24 ; Worcester v. Worcester Consol. Street R. Co., 196 U. S. 539, 25 Sup. Ct. 327, 49 L. Ed. 591 ; City of Pawhuska v. Pawhuska Oil & Gas Co., 64 Okl. 214, 166 Pac. 1058 ; Id., 250 U. S. 394, 39 Sup. Ct. 526, 63 L. Ed. 1054 ; Woodburn v. Public Service Commission, 82 Or. 114, 161 Pac. 391, L. R. A. 1917C, 98, Ann. Cas. 1917E, 996 ; State ex rel. Webster v. Superior Court, 67 Wash. 37, 120 Pac. 861, L. R. A. 1915C, 287, Ann. Cas. 1913D, 78 ; South Glens Falls v. Public Service Commission, 225 N. Y. 216, 121 N. E. 777 ; Salt Lake City v. Utah Light & Traction Co., 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715 ; Dubuque Electric Co. v. City of Dubuque, 260 Fed. 353, 171 C. C. A. 219, 10 A. L. R. 495, citing with approval New Orleans v. Water Works Co., 142 U. S. 79, 12 Sup. Ct. 142, 35 L. Ed. 943 ; Conery v. New Orleans Water Works Co., 41 La. Ann. 910, 7 South. 8.
The Attorney General cites the decision in Shreveport Traction Co. v. City of Shreveport, 122 La. 1, 47 South. 40, 129 Am. St. Rep. 345, as being opposed to the doctrine ¿stated; but the decision upon which the expression in that case was founded (Detroit v. Detroit Citizens’ Street R. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592), was not appropriate, as is explained in Milwaukee v. Railroad Commission, 283 U. S. 181, 35 Sup. Ct. 820, 59 L. Ed. 1254.
The ruling in Columbus Ry., Power & Light Co. v. Columbus (D. C.) 253 Fed. 499 ; Id., 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648, like the ruling in the Cleveland Case, 194 U S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, declaring the franchise an irrevocable contract, was founded upon peculiar provisions of the Constitution and laws of Ohio.
The question, however, whether the railway franchises heretofore granted by the city of New Orleans are binding contracts, not subject to. a change of the rate of carfare without the consent of the railways company, is not involved in this case. It is conceded, in the petition of the Attorney General, that it is with the consent of the railways company that the municipal council' intends to change the rate of car fare; and the demand for relief by injunction is merely to prevent the municipal council from making an agreement with the railways company in that respect.
Paragraph (d) of section 1 of the city charter tells us, in very plain language, that the specification of the particular authority conferred upon the municipal council by paragraph 12 of section 8 — the authority to grant franchises for street railways — shall not be construed as a limitation or impairment of any general grant of power of local govérnment. And then follows immediately the general grant of all of the powers, privileges and functions that the Legislature had granted or could grant to any city government, or that could be exercised by any city government. This court has not yet put a limit or restriction upon that language. On the contrary, we have said several times that- it shotild be given the full effect that it was *33 obviously intended to have. City of New Orleans v. Le Blanc, 139 La. 113, 71 South. 248 ; New Orleans v. Shuler, 140 La. 657, 73 South. 715 ; Le Bourgeois v. City of New Orleans, 145 La. 274, 82 South. 268.
A case remarkably similar to the one before us was that of the City and County of Denver v. Mountain States Telephone & Telegraph Co., 67 Colo. 225, 184 Pac. 604. The question in that case was, as it is here, whether the Public Utilities Commission of the state had authority to regulate the rates to be charged for a local public utility, within the city and county. The municipal government of Denver depended for its authority, not upon a specific grant of authority from the Legislature to fix rates, but upon a broad and general provision of its charters, somewhat similar to paragraph (e) of section 1 of the charter of the city of New Orleans. It was held that the broad and exhaustive grant of authority by the Legislature had conferred upon the municipal government “every power possessed by the Legislature in the making of a charter for Denver ;” and that that authority included the authority to regulate rates for local public utilities — not the authority to surrender irrevocably or barter away the police power in that respect — but the authority to establish rates, subject to and under the control of the sovereign power of the state.
[2] Our opinion is that the language of section 7 of article 6 of the Constitution of'1921 does reserve to the mrmicipal council of the city of New Orleans the rate-making authority over local public utilities, which authority would otherwise have been conferred upon the Louisiana Public Service Commission by section 4 of the same article. It is true section 7, in terms, reserves only “the powers of supervision, regulation and control over any street railway, * * • or other. local public utility.” It does not specify the authority to fix rates. But our opinion is that the reservation of “the powers of supervision, regulation and control” was intended to include, and does include, the authority to fix rates. In other words, the purpose of section 7 was to reserve to all municipalities that already had such powers all of the-powers that would otherwise have been taken from them and conferred upon the new state-board by section 4. The grant of authority to the new state board to fix rates, by section 4, is qualified by the expression “except as herein otherwise provided.” The expression quoted does not follow, immediately, the grant of “authority to supervise, govern, regulate and control,” but follows immediately the subsequent grant of authority, “to fix reasonable and just single and joint - line rates, fares,” etc. The first paragraph of section 4 is as follows :
“The commission shall have and exercise all necessary power and authority to supervise,, govern, regulate and control all common carrier railroads, street railroads, interurban railroads, steamboats and other water craft, sleeping car, express, telephone, telegraph, gas, eleetrie light, heat and power, water works, common carrier pipe lines, canals (except irrigation canals) and other public utilities in the state of Louisiana, and to fix reasonable and just single and joint line rates, fares, tolls or charges for the commodities furnished, or services-rendered by such common carriers or public utilities, except as herein otherwise provided.”'
The arrangement of the language quoted; leaves no doubt that the reservation, “except as herein otherwise provided,” refers to-the authority to fix rates. Moreover, the authority to fix rates is not “otherwise provided” anywhere in the Constitution, unless it be in section 7 of article 6, reserving to all municipalities that already had such powers-“the powers of supervision, regulation and control” over their street railways and other local public utilities. That section is as follows:
“Nothing in this article shall affect the powers of supervision, regulation and control over any street railway, gas, electric light, heat, power, waterworks, or other local public utility, now vested in any town, city, or parish *35 government unless and until at an election to be held pursuant to laws to be hereafter passed by the Legislature, a majority of the qualified electors of such town, city, or parish, voting thereon, shall vote to surrender such powers. In the event of such surrender such powers shall immediately vest in the Louisiana Public Service Commission; provided, that where any town, city, or parish shall have surrendered, as above provided, any of its powers of supervision, regulation and control respecting public utilities, it may in the same manner, by a like vote, re-invest itself with such powers.”
From the language of section 6 of the samé article, it appears that the framers of the Constitution deemed the expression, “under the control of the commission” sufficient to give the commission the power to fix rates. That section declares:
“If any common carrier or public utility now, or which may hereafter be placed, under the control of the commission, shall violate any of the rates, tolls, fares, or charges, or orders or decisions of the commission, such common carrier or public utility shall forfeit and pay to the State a penalty,” etc.
We infer from the language quoted that section 6, in referring to public utilities which may hereafter be placed under the control of the commission, refers particularly to local public utilities, the control of which by municipal governments may be surrendered to the commission by a vote of the electors of the municipality. The language is a recognition that there are public utilities in the state that are not “under the control of the commission;” and it is an acknowledgment that those public utilities that are not “under the control of the commission” are not subject to the authority-of the commission to fix rates, or to impose a penalty for a violation of an order fixing a rate.
We do not find any indication in the provisions of the new Constitution referring to public utilities (sections 3 to 9, inclusive, of article 6) of an intention to divide the authority over local public utilities — to give to a municipality the supervision, regulation and control, and give to the Louisiana Public Service Commission the rate-making authority, over a local public utility. There is no reason why such authority should ever be — and an obvious reason why it should never be- — so divided; for a division of it would only result in confusion, conflict of authority, and deadlocks.
We cannot imagine that the statesmen who drafted the sections of article 6 of the new Constitution, referring to the Louisiana Public Service Commission, did not know that the commission council of the city of New Orleans had theretofore exercised the authority to fix rates for street railways and other local public utilities. New Orleans is by far the principal city in the state, her population being 8 times as numerous as that of the next city in importance, and 16 times as numerous as that of the third in importance. If the constitutional convention had intended to put a stop to the municipal council’s exercising the authority to fix rates for local public utilities, it would have done it plainly, as the Legislature attempted to do, by the unconstitutional act of 1916. The reason why that statute was declared unconstitutional was that it violated the constitutional right of local self-government. It provided that a majority (four of the five) members of the local public utilities commission, thereby established, should be appointed by the Governor of the state; whereas article 319 of the Constitution of 1898 and of 1913 had reserved to the electors of the city the right to choose all public officers charged with the exercise of the police power of the city, in whole or in part. Observing that the power to fix rates for public utilities was an element of the police power, we held that the Legislature could not confer that power upon a local board,- without reserving to the electors of the city the right to choose the members of the board. The convention of 1921, in reserving to the electors of this city the right to choose their public officers— which was the city’s sheet anchor for home *37 rule — also reserved to the Legislature the right to provide for local boards or commissions, without authority, however, to control the ordinary governmental functions of the municipality. Article 14, § 22. All of which goes to show that the convention had the city of New Orleans in mind, while dealing with the subject of supervision, regulation and control over local public utilities, including the rate-making power.
Since the adoption of the Constitution of 1921, whereby, for the first time, the supervision, regulation and control over local public utilities, including the rate-making power (except in municipalities that already had that authority), was conferred upon an administrative board of state-wide authority, the Legislature has recognized that the municipal*’ council of the city of New Orleans had that authority, and that it was not taken away by the provisions of the new Constitution. By Act 93 of the Extra Session of 1921, which was held for the purpose of enapting such laws as were necessary to give full effect to the new Constitution, the Legislature amended section 8 of the charter of the city of New Orleans, by adding three paragraphs, viz.:
“In the exercise of its powers of supervision, regulation and control of any street railway, gas, electrio light, heat, power, water works, or other public utility, the commission council shall, in cases involving the establishment, change or alteration of rates, charges, tolls, prices, fares, or compensation for service or commodities supplied by such utilities, cause notice of the matter to be served upon the person or corporation .affected thereby, so that such person or corporation shall have an opportunity, at any time and place to be specified in said notice, to be heard in respect to said matter. The commission council shall make all necessary and reasonable rules and regulations to govern applications for the fixing or changing of rates and charges of public utilities and all petitions and complaints relating to any matter pertaining to the regulation of public utilities, and shall prescribe reasonable rules and regulations to govern the trial, hearing and rehearing of all matters referred to herein.
“The orders of the commission council fixing or establishing any rate, fare, toll or charge for -any commodity furnished, service rendered, or to- be rendered, by any public utility shall go into effect at such time as may be fixed by the commission council, and shall remain in effect and be complied with, unless and until set aside or suspended by the commission council or by a court of competent jurisdiction.
“The orders of the commission council shall' be enforced by the imposition of such reasonable penalties as the commission council may provide, and any party in interest may appeal from orders of the commission council to the courts by filing suit against the commission council within ninety days from the date of the-order of the commission council, and not thereafter.”
Paragraph 12 of that section of the city-charter (Act 159 of 1912, as amended by Act 21 of 1917 and by Act 29 of 1918), authorizing the commission council to grant franchises for street railways, was copied literally in the amending statute of 1921. The new provisions that were added by the statute of 1921 do not purport to confer upon the commission council the “powers of supervision, regulation and control,” or the rate-making power, over local public utilities, but merely prescribe the method by which the commission council shall proceed “in the exercise of its powers of supervision, regulation and control of any street railway,” etc., including the rate-making power.
It is true the statute of 1921 was enacted after this suit was filed; but it is an act of the state herself, plaintiff in this suit, speaking through the proper authority, the legislative department, acknowledging that the municipal council had the authority to fix rates for street railways and other local public utilities, and that the municipal council was not deprived of that authority by the Constitution of 1921. Of course, this declaration of the Legislature would have no effect if the rate-making power had been taken from -the municipal council by the Constitution of 1921. But the power was not taken from the municipal council by the Constitution of' 1921 if it was theretofore vested in the mu *39 nicipal council. And here we have an acknowledgment by the Legislature that the rate-making power was theretofore vested in the municipal council. Although this legislative declaration is not controlling, it is indeed persuasive, especially since the Legislature, holding, inherently, all rate-making power, as an attribute of sovereignty, has always tolerated the municipal council’s exercise of that authority over local public utilities. As Mr. Justice Lamar aptly said, in United States v. Midwest Oil Co., 236 U. S. 472, 35 Sup. Ct. 313, 59 L. Ed. 681:
“It may be argued that while these facts and rulings prove a usage they do not establish its validity. But -government is a practical affair intended for practical men. Both officers, lawmakers and citizens naturally adjust themselves to any long-continued action of the executive [or legislative] department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystalize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself — even when the validity of the practice is the subject of investigation.”
The Attorney General puts great stress upon the constitutional prohibition against a surrender or abridgement of the state’s police power. The prohibition appeared first in the Constitution of 1879, as article 235, and was retained in the Constitution of 1898 and of 1913, as article 263, viz.:
“The exercise of the .police- power of the state shall never be abridged nor so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state.”
The same prohibition was retained in the Constitution of 1921, as section 18 of article 19 abbreviated, thus:
“The exercise of the police power of the state shall never be abridged.”
[3] That does not mean that the police power of the state shall not be delegated to an administrative board or commission, or to a municipality or other political corporation. It means that the Legislature shall not irrevocably surrender the police power of the state, and that a delegation of any part of the police power to an administrative board or commission, or to a municipality or other political corporation, shall be always subject to revocation by the Legislature. The rate-making authority over local public utilities is one part of the police power which the Legislature itself does not usually exercise directly by a statute dealing with the particular subject. The authority to fix rates for public utilities is usually delegated to, and exercised by, an administrative board or commission; and, beyond all doubt, it may be conferred upon a municipal corporation, with regard to local public utilities. In that connection, it is very significant that the authority to fix rates for. local public utilities, before the adoption of the Constitution of 1921, was not vested in any administrative hoard or commission. The only attempt of the Legislature to vest such authority in an administrative hoard or commission was the ineffectual statute of 1916, undertaking to create such a board only for the city of New Orleans. The Legislature knew then that the rate-making authority over local public utilities was not vested in the rate-making commission of state-wide authority, or in any other rate-making board or commission — ■ knew that the rate-making authority was being exercised, and had always been exercised, by the municipal council of New Orleans — and knew that the Legislature itself had no intention of exercising such authority directly by local or special statutes on the subject, because the Legislature had never exercised the authority in that way.
Our conclusion is that the Attorney General, on behalf of the state, has no cause or right of action. For that reason, the judgment dismissing this suit is affirmed.