SIMON, J.,
dissents, adhering to the views expressed in the original opinion rendered June 29, 1956.
On Second Rehearing of Nos. 42930 and 42968
FOURNET, Chief Justice.
This case is now before us on second rehearing, limited, however, to a consideration of the correctness of our views on first rehearing with reference to the City of Monroe.[1] Our original opinion, 233 La. 478, 97 So.2d 56, delineated the manner in which the proceedings arose and set out the contentions variously advanced; it suffices now to summarize briefly that the United Gas Corporation, a privately owned public utility — which, on May 12, 1947, had formally accepted a gas franchise granted by ordinance of the Commission Council of the City of Monroe pursuant to authority from the electorate, the term being 25 years and specified rates being therein fixed — on July 1, 1955, applied to the Louisiana Public Service Commission to have the gas rates increased so as to provide a net yield of 6}/¿% upon its invested capital; the Commission having overruled a challenge to its jurisdiction founded on the City’s claim that the power to fix rates at which gas could be sold within the municipal limits of Monroe had been conferred by the City’s charter and had never vested in the Louisiana Public Service Commission, these proceedings were filed for injunctive» relief against the Commission; and from a judgment denying the permanent injunction and holding that the Commission had full and exclusive jurisdiction over the rates charged for gas by the United Gas Corporation in the City of Monroe, the City appealed.
When the case was first before us the Court, following the jurisprudence of this State holding that those municipalities vested at the time of the adoption of the Constitution of 1921 with the power to compulsorily fix rates for local public utilities were not affected by the general powers of the Louisiana Public Service Commission to supervise, govern, regulate and control public utilities in this State, *519 and finding as a fact that the City of Monroe, under the powers granted it by the Legislature, was given authority not only to grant franchises for the use of its streets in the laying of gas lines for the transportation, distribution and sale of gas and to regulate the same, but also to compulsorily fix and prescribe rates at' which the gas should be sold, reversed the judgment of the lower court and adjudged the Louisiana Public Service Commission enjoined from entertaining jurisdiction of or from holding a hearing on the application of United Gas Corporation for the revision of gas rates within the city of Monroe.
In a reconsideration of this case on first rehearing the Court reversed its ruling, first observing, “It is to be noted that Section 4 of Article 6 speaks of rate-fixing powers whereas Section 7 of Article 6 makes no mention of rate-fixing powers but refers only to the powers of supervision and control. A mere reading of these articles of the Constitution shows that supervision and control are treated separately from rate-fixing power, and that the supervision and control vested in the cities was not to be affected, but no such provision is made as to the rate-fixing power,” [233 La. 514, 97 So.2d 68], and concluded that while the City of Monroe under its charter[2] was given the power to fix gas rates by agreement, it had not the power to do so compulsorily and therefore the opinion in the Town of Ruston case was controlling (People’s Gas & Fuel Co. v. Louisiana Public Service Commission, 177 La. 722, 149 So. 435). The judgment of the lower court was therefore affirmed.
Upon the showing made on application for a second rehearing by the City of Monroe that the Court by its interpretation (contained in the observation quoted above) gave an import to Sections 4 and 7 of Article 6 of the Constitution[3] which was ir *521 reconcilable with previous adjudications on the same subject matter- — the Court having on at least two occasions [4] held that the authority to supervise, regulate and control local public utilities included the authority to fix rates, and that as to cities having such regulatory power at the time of the adoption of the Constitution of 1921, the Louisiana Public Service Commission was without rate-making authority — this second rehearing was granted.
While we have felt bound, as to cities operating under the Lawrason Act (e.g., City of West Monroe), by jurisprudence of this Court interpreting the rate-making powers over privately-owned utilities granted in that Act,[5] no such consideration obtains in the case of the City of Monroe, which operates under a special charter; and upon further careful study and analysis of cases interpreting the provisions of special charters with respect to the power to fix rates, in the light of Section 7, Article 6 of the Louisiana Constitution of 1921 declaring that nothing in the Article shall affect the powers of supervision, regulation and control over any local public utility then vested in a town or city, we are impressed not only with the soundness of the views expressed in the New Orleans and Baton Rouge cases[6] but also with the significance of those views in the light of their timely utterance, since the constitutional provisions pertinent here had then been recently framed and adopted; [7] and have con- *523 eluded that with respect to the special charter of the City of Monroe, our first solution as so the powers there granted was correct.
By original charter the Monroe city council (composed of a Mayor and nine councilmen) was granted power “To provide an adequate water supply, and to erect, purchase, maintain and operate waterworks and electric light plants, and to regulate the same; and prescribe rates at which water and gas and electric lights shall be supplied to the inhabitants.” This language is so clear that interpretation is unnecessary, and unless the amendments and reenactments of the section are restrictive of the power granted (as contended by counsel for the United Gas Corporation, which filed a petition of intervention and an answer in the lower court), the City still possessed it when the Constitution of 1921 was adopted.[8] A perusal of the charter’s amendments and reenactments pertinent to this case clearly shows that, rather than restricting the powers originally granted, the intention of the Legislature was to enlarge the authority of the council, since not only were the original powers retained unchanged in each enactment, but new powers were added.[9]
*525 The contention that the authority to establish rates by compulsion must be specifically granted has been considered by this Court and disposed of in the concise holding that “It is sufficient answer * * * to say that the fixing of * * * rates, either by contract or by compulsion, is within the police power of the state, and the granting of the power to fix rates without reservation or restriction carries with it the right to fix rates by either method.” Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 552, 100 So. 710, 714.
The next contention of counsel for the Public Service Commission is that whatever, if any, regulatory rate-making power Monroe ever had over a private gas utility company was repealed and taken away by Act 6 of the Second Extra Session of 1934; and that by Act 19 of that same session, the power to fix and regulate rates charged and service furnished by certain local public utilities, including gas, was placed in the Louisiana Public Service Commission. This contention is without merit.
In granting a second rehearing in this case it was our intention to limit it to the errors hereinabove mentioned; but having failed to so provide, we have re-examined the two acts of the Legislature above mentioned — bearing in mind the action taken by the Legislature of 1950 when, in adopting the Revised Statutes, it incorporated not only the provisions of Act 19 of the Second Extra Session of 1934 (R.S. 45:1163 and 1164) but also those of Act 116 of the Extra Session of 1921 which, following the mandate contained in Section 7 of Article 6 of the Constitution that laws be passed by the Legislature covering the subject, prescribed the procedure to be followed by a municipality desiring to surrender its powers of supervision, regulation and control to the Public Service Commission or to reinvest itself with such powers (R.S. 33:4491 et seq.); and taking note of the correlation between those sections of the Revised Statutes and the various pertinent provisions of Article 6 of the Constitution, all of which matters were ably analyzed in our original opinion, after further careful analysis and study we have concluded that we were correct in our initial pronouncements and that no useful purpose would be gained by reiterating them here.
For the reasons assigned, the judgment of the district court is annulled and set aside and our original decree is reinstated; accordingly, it is now ordered, adjudged and decreed that the Louisiana Public Service Commission be, and the same is hereby permanently restrained and enjoined from entertaining jurisdiction of or from holding a hearing on the application of United Gas Corporation in Docket No. 6873 of said Commission for the revision of gas rates within the City of Monroe.
*527 PONDER, HAMITER, and HAWTHORNE, JJ., dissent with written reasons.

. As explained in our original opinion, the City of Monroe and the City of West Monroe instituted separate proceedings challenging the jurisdiction of the Louisiana Public Service Commission, upon application of the United Gas Corporation, to fix gas rates within their respective municipalities; appeals by the cities from adverse judgments of the lower court were consolidated here for purposes of determination of the issue. The application of the City of West Monroe for a second rehearing was denied.

. Act 47 of 1900, as amended and reenacted by Act No. 35 of 1904 and Act No. 130 of 1906.

. Section 4: “The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all * ' * * gas * * * and other public utilities in the State of Louisiana, and to fix reasonable and just single and joint line rates, * * * for the commodities furnished, or services rendered by such * * * public utilities, except as herein otherwise provided. * * Section 7: “Nothing in this article shall affect the powers of supervision, regulation and control over any * * * gas * * * or other local public utility, now vested in any town, city * * * government unless and until at an election to be held pursuant to laws to be hereafter passed by the Legislature, a majority of the qualified electors of such town, city * * * voting thereon, shall vote to surrender such powers. In the event of such surrender such powers shall immediately vest in the Louisiana Public Service Commission; provided, that where any town, city * * shall have surrendered as above provided, any of its powers of supervision, regulation and control respecting public utilities, it may in the same manner, by a like vote, re-invest itself with such powers.” (Article 6, Louisiana Constitution of 1921).

.In State v. City of New Orleans, 151 La. 24, 91 So. 533, this Court, in an exhaustive and well-considered opinion, said: “ * * * It is true section 7, in terms, reserves only, ‘the powers of supervision, regulation and control over any street railway, * * * or other local public utility.’ It does not specify the authority to fix rates. But our opinion is that the reservation of ‘the powers of supervision, regulation and control’ was intended to include, and does include, the authority to fix rates. * * ” (151 La. at pages 33-34, 91 So. at page 537) “We do not find any indication in the provisions of the new Constitution referring to public utilities (sections 3 to 9, inclusive, of article 6) of an intention to divide the authority over local public utilities — -to give to a municipality the supervision, regulation and control, and give to the Louisiana Public Service Commission the rate-making author; ity, over a local public utility. There is no reason why such authority should ever be — and an obvious reason why it should never be — so divided; for a division of it would only result in confusion, conflict of authority, and deadlocks.” 151 La. at pages 35-36, 91 So. at page 537. That holding was affirmed in the case of Baton Rouge Waterworks Co. v. Louisiana Pub. Serv. Comm., 156 La. 539, 100 So. 710.

. See People’s Gas & Fuel Co. v. Louisiana Public Service Comm., 177 La. 722, 149 So. 435, and Gulf Public Service Co. v. Louisiana Public Service Commission, 177 La. 911, 149 So. 517.

. State v. City of New Orleans, 151 La. 24, 91 So. 533; Baton Rouge Waterworks Co. v. Louisiana Public Service Comm., 156 La. 539, 100 So. 710.

. As pointed out in our original opinion, “We are cognizant of the fact that the conclusions reached in the New Orleans case, supra [State v. City of New Or *523 leans, 151 La. 24, 91 So. 533], were concurred in by the entire court of nine justices, as then constituted, two of whom, namely, Justices Dawkins and Overton, having served as members of the constitutional convention of 1921, were undoubtedly aware of the purposes of the framers of the Constitution in the adoption of Article 6 and particularly the sections thereof bearing on the case at bar.”

. The Louisiana Constitution of 1921, in creating the Louisiana Public Service Commission (Article 6, Section 3) and vesting it with authority to “supervise, govern, regulate and control * * * gas * * * and other public utilities in the State of Louisiana, and to fix reasonable and just single and joint line rates * * * for the commodities furnished, or services rendered by such * * * public utilities, * * * ” (Article 6, Section 4), declared that “Nothing in this article [Article 6] shall affect the powers of supervision, regulation and control over any * * * gas * * * or other local public utility, now vested in any town, * * * ” unless o r until a majority of the qualified electors shall vote to surrender such powers; and in the same manner, by a like vote, the city may reinvest itself with powers previously surrendered (Article 6, Section 7).

. Paragraph 7, Section 9 of the original charter, Act 47 of 1900, as amended and reenacted by Act 35 of 1904, is shown below, the 1904 amendment being indicated by italics: “Seventh — To provide an adequate water supply and to erect, purchase, maintain and operate water works and electric and, gas light plants, and to regulate the same, and prescribe rates at which water and gas and electric lights shall be supplied to the inhabitants and, also, to construct, own, operate and maintain within and without the city, and within or without the Parish of Ouachita, electric street raiUoays and to supply electric poioer to private individuals or corporations for any purpose.” In 1906, by Act 130 of the Legislature of that year, there were added, after the words “electric street railways,” the following: “and to carry thereon freight and passengers;” and at the end, following the word “purpose,” were added the words “and to fix the charges therefor.”