GULOTTA, Judge.
The issue in this case is whether New Orleans Public Service, Inc. (NOPSI) has the authority to issue long term securities without obtaining the prior approval of the City Council of New Orleans. NOPSI, its parent company Middle South Utilities, Inc. (Middle South), and their officers appeal from a preliminary injunction enjoining them from “preparing to and/or issuing and selling” additional NOPSI first-mortgage bonds, preferred stock or common stock without such approval. We affirm.
BACKGROUND
In April, 1922, in connection with the reorganization of the financially troubled New Orleans Railway & Light Company into a “new company” now known as NOP-SI, the Commission Council of the City of New Orleans adopted Ordinance No. 6822, hereinafter referred to as the “Settlement Ordinance”. In pertinent part, Section 9(g) of the Settlement Ordinance (as amended by Ordinance No. 1443 on July 17, 1958) provided:
“(g) No securities of the new Company [NOPSI], other than evidences of debt having maturities of twelve months or less and securities issued as stock dividends neither of which has any effect on the rate base, shall be issued without the previously obtained approval of the Council.”
In later ordinances NOPSI was given indeterminate permits (i.e., without fixed terms) to operate a street railway system, electric light and power plants and systems, and gas plants and systems in the City. By virtue of these ordinances, as well as the Settlement Ordinance, the City acquired a perpetual option to purchase NOPSI’s facilities.
On August 6, 1981, the Council adopted Ordinance No. 8264, known as the “Amending Ordinance”, calling for an election on proposed amendments to the City’s Home Rule Charter “relative to surrender” of the Council’s “powers of supervision, regulation and control over gas, heat, power and electric public utilities within the City of New Orleans to the Louisiana Public Service Commission [LPSC]”. The electorate of the City voted in favor of the proposals on November 23, 1981, and the Home Rule Charter was thereby amended to read in pertinent part, as follows:
“Section 4-1604. Establishment of Rates. In the exercise of its powers of supervision, regulation and control of any street railroad, water-works or other public utility; provided that beginning January 1, 1982 the City’s powers of supervision, regulation and control shall *235 not extend to nor include gas, heat, power and electric public utilities; the Council shall_
“Beginning January 1, 1982 the Louisiana Public Service Commission shall regulate New Orleans Public Service, Inc. and Louisiana Power and Light Company, their respective successors and assigns, within the Parish of Orleans, and the Council of the City of New Orleans shall furnish to said Public Service Commission all information, records, documents and such other materials as shall be necessary and proper for the transfer of regulatory powers from the said council. All rates, regulations, controls and other pending matters on December 31, 1981 shall continue with the same force and effect thereafter subject to any further actions by the Louisiana Public Service Commission.”
On December 21, 1984, Middle South Utilities, Inc. and its subsidiary NOPSI requested authorization from the federal Securities and Exchange Commission (SEC) for the issuance and sale by NOPSI of up to $40 million principal amount of first mortgage bonds, the establishment of not more than 200,000 shares of preferred stock having a par value of $100 per share, and NOPSI’s issuance and sale to Middle South Utilities of up to four million shares of NOPSI’s common stock at a par value of $10 per share for an aggregate cash consideration of up to $40 million. According to the affidavit of its chief financial officer, NOPSI intended to use the proceeds of these issues to pay short term obligations, including part of NOPSI’s obligations to its parent Middle South Utilities for advance purchases of power, and to finance part of its 1985 construction program.
In the SEC proceedings the City asserted that the Council had not given its prior approval to NOPSI for the issuance of the described securities. On February 21, 1985, however, the SEC issued an opinion and order authorizing the issuance and sale of the securities, based on conclusions that the amendment of the City’s Home Rule Charter had divested the City of regulatory authority over NOPSI in favor of the LPSC and had constituted a repeal by implication of Section 9(g) of the Settlement Ordinance.
Meanwhile, on January 28, 1985, the City had filed a “PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF” in Orleans Parish Civil District Court against NOPSI, Middle South and certain of their officers, to enjoin and prohibit them from issuing or preparing to issue the securities without the Council’s approval. The Council intervened in this suit seeking the same relief as the City. On March 15, 1985, after reviewing the largely undisputed facts, the trial judge issued the preliminary injunction now the subject of the instant appeal.
In written “REASONS FOR JUDGMENT”, the trial judge cited LSA-R.S. 33:4405, which provides that the governing authority of a city may prescribe conditions of franchise permits granted to local public utilities. He concluded that Section 9(g) of the Settlement Ordinance was such a condition relating to the City’s original grant of NOPSI’s operating permits rather than the regulation of NOPSI’s rates and services. Accordingly, he held that the transfer of regulatory control of NOPSI from the Council to LPSC had not affected the Council’s Section 9(g) authority and that the Council’s prior approval remained a prerequisite to NOPSI’s issuance of the securities.
CONTENTIONS
According to defendants, a reading of Section 9(g) in pari materia with the entire Settlement Ordinance, the operating permits, the Amending Ordinance, LSA-R.S. 33:4491, and the Home Rule Charter compels a conclusion that Section 9(g) is a power of “supervision, regulation and control” over NOPSI. Defendants argue therefore that the City has surrendered this power and can no longer invoke this approval or disapproval of the securities issuance.
In support of their contention that Section 9(g) is a regulatory rather than a franchise power, defendants rely on the repetí- *236 tive use of the phrase “supervision, regulation and control” in the wording of pertinent ordinances and statutes. Specifically, defendants note that the Settlement Ordinance begins:
“Be It Ordained, that in the exercise of its powers of regulation, supervision and control over the street railway, electric and gas properties in this city now owned by the New Orleans Railway & Light Company, the Commission Council of the City of New Orleans does hereby find and order as follows_” [Emphasis supplied]
Defendants further observe that Section 9 of the Settlement Ordinance, repeats this phraseology:
“So long as the City of New Orleans or its successors as the regulatory authority with supervision, regulation and control of the company and its properties —shall not disturb, interfere with or change the valuation or rate of return herein fixed, the conditions and restrictions hereinafter set out shall be and continue in full force and effect and shall be binding upon and observed by the Company [NOPSI], its successors and assigns. ...” [Emphasis supplied]
Continuing in this vein, defendants also point out that the ordinances which grant indeterminate permits to NOPSI to operate utilities in the City contain preambles with the following reference to the Settlement Ordinance:
“Whereas, under Ordinance No. 6822 [the Settlement Ordinance] ... certain orders have been made and entered by the City of New Orleans in the exercise of its regulatory power over and control of public utilities....” [Emphasis supplied]
Defendants further assert that the Amending Ordinance, which was submitted to the Orleans electorate in accordance with LSA-R.S. 33:4491,[1] called for an election concerning the amendment of the Home Rule Charter “... relative to surrender of the Council of the City of New Orleans’ powers of supervision, regulation and control over gas, heat and electric public utilities within the City of New Orleans to the Louisiana Public Service Commission [Emphasis supplied]”. According to defendants, the subsequent amendment of Section 4-1604 of the Home Rule Charter nullified the City’s “powers of supervision, regulation and control”, including Section 9(g) of the Settlement Ordinance, over NOPSI’s gas and electric utility operations, and resulted in the “transfer of regulatory powers” to the LPSC.
MERITS
We reject defendants’ contention that the trial judge erred when he concluded that Section 9(g) of the Settlement Ordinance is a condition relating to the City’s grant of the original franchise rather than one relating to the supervision, regulation and control of rates and services.
In “Reasons for Judgment”, the trial judge stated:
“In 1922, NOPSI’s predecessor experienced financial difficulties and underwent involuntary reorganization. The City, as the franchising authority and rate regulator, entered into a settlement agreement with this company which agreement was later embodied in Ordinance No. 6822 (Settlement Ordinance). This ordinance established the conditions for the grant of any future utility franchise, the basic rate making provisions, and the formulas and valuations for the city’s perpetual option to repurchase utility property.
“Several months later, three ordinances were enacted which granted specific franchises for railway, electric, and gas service. These ordinances all acknowledged their supplementary character to the basic conditions, provisions, *237 etc. contained in the Settlement Ordinances. ...
“After reviewing the uncontested documents submitted as evidence and considering the argument of counsel, the Court concludes that the Settlement Ordinance sections and subsequent franchise ordinance sections based upon the power to grant franchises were not repealed by the transfer of supervision, regulation, and control of rates and service to the LPSC....
“LSA-R.S. 33:4405 provides that the governing authority may prescribe, stipulate, or agree to such other conditions of the grant of the franchise and right to a perpetual franchise as it deems proper. Clearly conditions [Section 9] (a) through (g) are derived from this authority. These conditions, when read in conjunction with the other sections based on that authority, constitute an integrated scheme designed to insure that the utility would be capable of fulfilling its franchise obligations and provide the City with a stable, uninterrupted source of gas and electric power.”
A reading of the Settlement Ordinance and the operating permits in light of their legislative history and purpose supports the trial court’s reasoning.[2]
Although the Settlement Ordinance makes reference to the Council’s powers of “regulation, supervision and control”, its raison d’etre was the reorganization of the financially troubled New Orleans Railway & Light Company, which was then in receivership and beseiged by creditors. In this regard, Section 3 of the Settlement Ordinance states, “Subject to the approval of the Federal Judge, who has jurisdiction of the existing Receivership, the financial plan of the new company shall make disposition in reference to existing outstanding securities of New Orleans Railway & Light Company_” Section 11 of the Settlement Ordinance provides also that litigation pending against the City in federal district court shall be dismissed “[u]pon putting of the within plan in operation”. Section 12 provides that the Settlement Ordinance shall take effect “only upon written acceptance and approval by the Creditors of the New Orleans Railway & Light Company and other parties at interest....”
Accordingly, within this historical context and toward this goal of creating a financially viable public utility out of a defunct one, the Council set forth a number of fiscally related conditions in the Settlement Ordinance to insure the continued financial stability of the new company. These provisions included: the establishment of a rate base (Section 1); the imposition of rates necessary to produce a minimum net revenue equivalent to llk% per annum allowable rate of return on the rate base (Section 2); a reorganization of the old company into the new company with a financial plan subject to approval by the federal judge in charge of the receivership to dispose of existing outstanding securities of the old company (Section 3); test rates and charges to be adopted for twelve month period upon termination of the existing receivership and reorganization into the new company (Section 4); requirements that the books of account of the new company be maintained in accordance with an accounting system approved by the Council and that representatives of the City be given access to the books, records, power houses and other property of the new company (Section 5); the sale of unused real estate and reinvestment of the proceeds into property useful for the new company’s purposes (Section 6); a perpetual option by the City to purchase NOPSI’s properties (Section 7); and the contemplation of future agreements between the City and *238 NOPSI as to details of the new franchises and the “making of any other changes in the physical property which will contribute to more economical and satisfactory operation” (Section 8).
In furtherance of this scheme of financial stability, Section 9 of the Settlement Ordinance enumerates several “stipulations, restrictions and conditions” to be “binding upon and observed” by NOPSI. Section 9 sets forth detailed requirements concerning NOPSI’s corporate structure, including: the total par value of outstanding securities of the new company; the necessity that the president and two-thirds of the directors of NOPSI reside in New Orleans; the establishment of funds to retire bonds before any disbursements can be made out of earnings or surplus or on preferred stock; restrictions on the dividends payable on the common stock; and finally, in Subsection (g), the Council’s pri- or approval of NOPSI’s security issues.
Accordingly, we conclude that Section 9(g) is therefore an integral part of the City’s comprehensive framework to insure the financial stability of NOPSI and to prevent a recurrence of the financial collapse suffered by the New Orleans Railway & Light Company.
Following enactment of the Settlement Ordinance in 1922, indeterminate permits for NOPSI’s operations in the city were granted later in the same year. Although these operating permits do not specifically mention the Council’s approval or disapproval of NOPSI’s securities, it is clear that the provisions of the Settlement Ordinance are inextricably woven into the conditions of NOPSI’s franchise. Each of these ordinances is styled as “supplementing Ordinance 6822 [Settlement Ordinance], which provides for the reorganization of New Orleans Railway & Light Company and its subsidiary companies.... ” These “franchise” ordinances further note that under the Settlement Ordinance an “arrangement” has been made between the
City and the creditors of the Old Company “looking to the reorganization of the old company and the rehabilitation of its properties so as to improve the public service”. The gas and electrical operating permits specifically note that the Settlement Ordinance has contemplated the grant of new permits or franchises or the extension of existing franchises so as to “through co-operative effort ... bring about more economical and satisfactory operation” of the utility properties. This language demonstrates the interrelationship of the Settlement Ordinance and the operating permits in the structure of the public utility, and reveals the nature of Section 9(g) as a franchise power rather than a regulatory power.
Defendants contend, however, that the provisions of Section 9 of the Settlement agreement became nugatory when the City transferred to the LPSC, in the Amending Ordinance, the responsibility to change or modify NOPSI’s rate base and rate of return. According to defendants, Section 9 provides that the conditions and restrictions, particularly Section 9(g), will remain in full force and effect only so long as the City of New Orleans or its successors do not disturb or interfere with the valuation or rate of return. Defendants further point out that Section 10 of the Settlement Ordinance likewise states that the public utility binds itself not to infringe or violate the provisions of Section 7 and Section 9, as long as the City does not change or disturb the rate base or rate of return. Defendants assert that the City can no longer invoke the right of appeal under Section 9 because it has surrendered or abrogated its power to maintain unchanged the rates of base and return by relinquishing the regulatory authority over NOPSI to the LPSC.
We reject this argument. In the first place, there is no evidence in the record of any alteration or change in the rate base or rate of return.[3] Furthermore, *239 we cannot speculate that the transfer of regulatory authority from the Council to the LPSC will result in a change in the rate base or rate of return within the meaning of the Settlement Ordinance. On the basis of the record before us, we therefore conclude that the conditions of Section 9 of the Settlement Ordinance remain binding upon NOPSI.
We reject also defendants’ argument that the 1981 Amending Ordinance, has nullified and repealed Section 9(g) of the Settlement Ordinance. To reach such a conclusion would lead to an untenable result.
In the instant case, because NOPSI is a subsidiary of Middle South Utilities, a company which is subject to SEC jurisdiction, the LPSC has no authority concerning these proposed security issues.[4] It is inconceivable that the City Council would, by virtue of the Amending Ordinance, relieve NOPSI from the conditions set forth in the Settlement Ordinance (and the franchise ordinances) and defer to the discretionary authority of a federal agency. The defendants’ interpretation of these ordinances would thereby defeat the painstaking effort, as reflected in the Settlement Ordinance, to insure the City’s role in maintaining the financial stability of this public utility to prevent another financial collapse like that suffered by NOPSI’s predecessor.
Accordingly, we do not construe the Amending Ordinance to nullify and repeal Section 9(g) of the Settlement Ordinance. We therefore hold that NOPSI does not have the authority to issue long-term securities without obtaining the prior approval of the City Council of New Orleans. Our holding is consistent with the jurisprudential rule that courts must construe a statute so as to give it effect rather than render it meaningless. State v. Mestayer, 144 La. 601, 80 So. 891 (1919); Dupre v. Lafourche Parish Police Jury, 376 So.2d 986 (La.App. 1st Cir.1979). Moreover, as noted by the trial judge, repeals by implication are not favored and will not be indulged if there is any other reasonable construction. State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601 (1937); Gulf Oil Corporation v. State Mineral Board, on rehearing, 317 So.2d 576 (La.1975).
Furthermore, we do not interpret our holding in this case to be inconsistent with the Louisiana Supreme Court’s decision in State v. City of New Orleans, 151 La. 24, 91 So. 533 (1922), where the court rejected the argument that the City could retain the supervision, regulation and control of a public utility while the LPSC could only have rate-making authority. The Supreme Court stated:
“We do not find any indication in the provisions of the new Constitution referring to public utilities (sections 3 to 9, inclusive, of article 6) of an intention to divide the authority over local public utilities — to give to a municipality the supervision, regulation and control, and give to the Louisiana Public Service Commission the rate-making authority, over a local public utility. There is no reason why such authority should ever be — and an obvious reason why it should never be— so divided; for a division of it would only result in confusion, conflict of authority, and deadlocks.” (Supra, at p. 537).
The issue in the cited case was whether the City or the LPSC had the power to regulate New Orleans streetcar fares. The Supreme Court held that the City had rate making authority, and rejected the State’s argument concerning a division of regula *240 tory authority. The instant case is distinguishable from the cited case, however, because the City Council’s authority to approve or disapprove of NOPSI’s long term securities under Section 9(g) of the Settlement Ordinance is not a rate making power but is a condition of NOPSI’s status as a franchisee with indeterminate permits for utilities in the City. Unlike the cited case, we are not confronted in our case with a division of regulatory powers, but with a co-existence of the City’s franchise power and the LPSC’s power to regulate utility rates and services. Because the Council’s authority under Section 9(g) is separate and apart from the LPSC’s regulatory power, it does not infringe upon the LPSC’s jurisdiction.[5]
Accordingly, we affirm the trial court’s judgment.
AFFIRMED.

. LSA-R.S. 33:4491 provides that a city ",.. exercising powers of supervision, regulation and control over any public utility, desiring to surrender those powers to the Louisiana Public Service Commission may submit the question of surrendering those powers to the qualified electors....”

. LSA-C.C.Art. 18 reads as follows: Art. 18 Reason and Spirit of laws
"The universal and most effectual way of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the Legislature to enact it.”
See also J.M. Brown Const. Co. v. D & M. Mechanical Con., Inc., 275 So.2d 401 (La.1973); Clark v. Board of Com'rs, Etc., 422 So.2d 247 (La.App. 4th Cir. 1982).

. Although defendants have attached certified copies of two orders by the LPSC in support of their argument in their reply brief to this court, we cannot take judicial cognizance of a change in the rate base or rate of return, as asserted by defendants. We cannot consider any evidence *239 that was not admitted in the trial court or that was not added to the record on appeal by stipulation of the parties. Capital Bank & Trust Co. v. Lacey, 393 So.2d 668 (La.1980); King v. National Bank of Bossier City, 420 So.2d 1024 (La. App. 5th Cir.1982).

. Although LSA-R.S. 45:1168 provides that no public utility subject to the authority of the LPSC shall issue any security until it has been authorized to do so by order of the LPSC, LSA-R.S. 45:1175 exempts from LPSC’s scrutiny those securities of public utilities subject to the jurisdiction of the Securities and Exchange commission under the Public Utility Holding Company Act of 1935.

. On May 4, 1985, the voters of New Orleans approved a proposal to re-amend the City's Home Rule Charter to transfer the powers of supervision, regulation and control of NOPSI back to the City Council.